**UNITED STATES of America, Plaintiff,**

**and**

**Yonkers Branch, NAACP, et al., Plaintiff–Intervenors,**

**v.**

**CITY OF YONKERS, Yonkers Community Development Agency, Yonkers Board of Education, Defendants,**

**and**

**U.S. Department of Housing and Urban Development, Samuel Pierce, Secretary, Added–Defendants,**

**and**

**The State of New York; Mario Cuomo, as Governor of the State of New York; The Board of Regents of the State of New York; Martin C. Barell, R. Carlos Carballada, Adelaide L. Sanford, Willard A. Genrich, Emlyn I. Griffith, Jorge L. Bat-**

tista, Lora Bradley Chodos, Louise P. Matteoni, Edward Meyer, Floyd S. Linton, Salvadore Sclafini, Mimi Levin Lieber, Shirley C. Brown, Norma Gluck, Thomas Frey and James McCabe, Sr., in their official capacities as members of the State Board of Regents; The Department of Education of The State of New York; Thomas Sobol, as Commissioner of Education of the State of New York; and The Urban Development Corporation of the State of New York and Vincent Tese, as Director of the Urban Development Corporation, Added–Defendants.

No. 80 Civ. 6761 (LBS).

United States District Court, S.D. New York.

March 27, 1995.

Michael H. Sussman, Goshen, NY, for plaintiff-intervenors NAACP.

Dennis C. Vacco, New York City, Atty. Gen. of State of N.Y., for N.Y. State defendants; Harvey J. Golubock, Howard L. Zwickel, Marion R. Buchbinder, Stephen Jacoby, Barry S. Schaevitz, of counsel.

Hogan & Hartson, Washington, DC, for Yonkers Bd. of Educ. of the City of Yonkers; Steven J. Routh, Daniel B. Kohrman, Paul A. Minorini, of counsel.

Anderson Banks Moore Curran & Hollis, Mt. Kisco, NY; Lawrence W. Thomas, of counsel, Whiteside & Fitzpatrick, Birmingham, AL, for City of Yonkers; Raymond P. Fitzpatrick, Jr., David P. Whiteside, of counsel.

## OPINION

SAND, District Judge.

In response to the efforts of the Yonkers Board of Education ("YBE") and the Yonkers Branch, NAACP (collectively, "plaintiffs") to add as defendants the State of New York, the State Board of Regents, and various other State education officials (collectively, "the State"), as well as the Urban Development Corporation ("UDC") and its director, this Court has held a number of hearings and issued several opinions, familiarity with which we assume herein. *See United States v. Yonkers*, 833 F.Supp. 214 (S.D.N.Y. 1993) (holding that vestiges of segregation persist in the Yonkers Public School System); *United States v. Yonkers*, No. 80 Civ. 6761, 1992 WL 176953 (S.D.N.Y. July 10, 1992) (denying the State's motion for summary judgment); *United States v. Yonkers*, No. 80 Civ. 6761, 1989 WL 88698 (S.D.N.Y. August 1, 1989) (denying the State's motion to dismiss), *appeal dismissed,* 893 F.2d 498 (2d Cir.1990).

Following the last determination as to vestiges, the Court has conducted an exhaustive inquiry[1] into the question of liability of the State and the UDC for the condition of unlawful *de jure* segregation which this Court has previously found to exist in the Yonkers Public School System. *United States v. Yonkers Bd. of Educ.,* 624 F.Supp. 1276 (S.D.N.Y.1985), *aff'd,* 837 F.2d 1181 (2d Cir. 1987), *cert. denied,* 486 U.S. 1055, 108 S.Ct. 2821, 100 L.Ed.2d 922 (1988).[2]

By consent of the parties, there was established as a cut-off date for purposes of this inquiry the date of this Court's November, 1985 Opinion holding the City of Yonkers liable for the segregated conditions the Court found to exist. The virtue of the 1985 cut-off date is, of course, that it enables greater utilization of the record compiled in the original liability proceedings and permits the question to be posed whether the Court would have found the added State defendants to be liable had they been named as parties in the original proceedings. There was reserved to the parties the right to present evidence concerning the period November, 1985 to date as part of a subsequent remedy

---

1. The YBE and NAACP introduced testimony of 31 witnesses and deponents and approximately 200 exhibits as well as three sets of admissions dealing with undisputed issues. The State also called several witnesses and introduced substantial documentation.

2. In our vestiges opinion, we relied upon a comparison of achievement scores of minority and majority students *within* the Yonkers school district in concluding that minority students in Yonkers were not being afforded equal educational opportunities. Thus, the issue which is arguably before the United States Supreme Court in *Missouri v. Jenkins,* No. 93–1823, 1995 WL 61093 (U.S. argued Jan. 11, 1995), in which petitioner alleges that the trial court impermissibly engaged in a comparison of student test results in the school district in question with student test results in other (*i.e.,* suburban) districts, was not before this Court.

proceeding, should such be deemed appropriate.

The Court has gathered from the parties, especially from counsel for the NAACP, who proffered evidence concerning post–1985 events, that any such evidence would be of a cumulative nature and not qualitatively different from the vast submissions already made. Such evidence, while perhaps pertinent to remedy, would seem to have little impact on questions of liability. We have therefore proceeded to determine questions of State liability on the basis of the present record. If a party is of the opinion that post–1985 evidence would alter any of the legal or factual conclusions set forth in this Opinion, and wishes for that reason to reopen these proceedings, the Court should be so advised in writing no later than 20 days from the date of this Opinion. The writing should set forth a description of the evidence that the party would seek to introduce and the reasons why it is believed that such additional evidence would lead to a change in the rulings made herein.

## I.

## THE CONTENTIONS OF THE PARTIES

The YBE and NAACP contend that the State contributed to the segregated status of the Yonkers Public Schools in several ways. The major emphasis has been on the alleged failure of the State officials primarily charged with education duties, i.e., the members of the Board of Regents, the Commissioner of Education, and representatives of the Department of Education of the State of New York ("SED"), "to execute [State] education policy on racial integration and in impeding the implementation of that policy by local school officials in Yonkers." Yonkers Board of Education's Post–Trial Brief on State Liability Issues ("YBE Post–Trial Brief") at 2. Further, it is claimed that the State "unlawfully established an 'explicit racial' classification by singling out the racial integration policy as the one State education policy that would not be executed in accordance with the normal process of governance and decision making for education in New York State." Id. Independently of these grounds for the imposition of liability, the

YBE and NAACP contend that the State is liable because of its participation in the development of housing in Yonkers which had a "known and foreseeable segregative effect on the public schools of Yonkers." Id. at 2–3.

The State asserts various defenses to these charges, including those of sovereign immunity and other jurisdictional defects. With respect to the housing claims, the State raises the defenses of statute of limitations and laches. On the merits, the State asserts that this case is controlled by Arthur v. Nyquist, 573 F.2d 134 (2d Cir.), cert. denied, 439 U.S. 860, 99 S.Ct. 179, 58 L.Ed.2d 169 (1978), and that the YBE and NAACP's claims that the State could and should have more aggressively pursued efforts to end segregation have already been rejected as a basis for asserting liability against the State. The State further asserts that the YBE and NAACP have failed to prove that the actions of either the UDC or the State defendants with respect to housing caused segregative consequences to the Yonkers Public School System. The City of Yonkers supports the position of the YBE and NAACP that the State is liable for contributing to such conditions of segregation which the Court has found to exist in Yonkers.

## II.

## FINDINGS OF FACT

### A. *Schools*

The YBE and NAACP claim that there is a causal relation between the acts and omissions of the State and the continuation of segregation in the Yonkers Public School System. The gist of their argument is as follows: that the State was aware of the severely segregative conditions that existed in the Yonkers Public Schools; that the State had the legal authority as well as the practical power to intervene in Yonkers and to compel Yonkers officials to take steps to remedy those conditions; that State officials, motivated by a fear of controversy, an aversion to aggressive efforts at integration, and, in some instances, racial prejudices, effectively adopted a hands-off policy toward Yonkers, whereby the State would act in support

of desegregation only if invited to do so by an individual complainant or by the Yonkers authorities themselves; and that this hands-off policy had the foreseeable effect of preserving the segregative conditions in the Yonkers Public Schools.

Having reviewed the entire record, the Court finds there to be ample evidence supporting the plaintiffs' contentions regarding the nature of the State's desegregative posture prior to 1985. Our specific factual findings are outlined directly below. In a later section, we will explain why the facts, as found, nonetheless do not provide a basis for holding the State liable as a constitutional joint tortfeasor under 42 U.S.C. § 1983, and why we do not reach the merits of possible State liability under The Equal Educational Opportunities Act of 1974, 20 U.S.C.A. § 1701 *et seq.* (West 1990).

### 1. *What the State Knew*

There can be no doubt that the State was aware early on of the existence of at least *de facto* segregation in the Yonkers Public Schools. The record in this area begins with a February, 1968 letter from Yonkers resident Ruth Lowe to then–State Education Commissioner James E. Allen, informing him that

> Yonkers public schools really need investigation—especially those in the predominantly Black ghetto areas. School 19 is a perfect example. This school has de facto segregation. Additionally, areas have been gerrymandered to keep this school segregated.... Something should be done to break up the All White and All Black schools of Yonkers. Can you do anything?

YBE Exh. 16–20. Commissioner Allen's assistant, Wilbur Nordos, wrote Ms. Lowe back that it was his hope that his division—the Division of Intercultural Relations, which at the time had the primary responsibility for promoting racial integration in New York schools—could "be of help to the school authorities in Yonkers in working toward a reduction of racial imbalance in the schools of that City." *Id.* Whether intended to be that help or not, SED staff member Norman Kur-

land showed up in Yonkers several months later, telling a Yonkers audience that, from the data available, it was evident that

> there is great inequality in the schools of Yonkers. In the six schools with 31 percent or more Negro students, and the greatest concentration of Negro students in the City, we find these schools to be persistently below the minimum competence level.... With only 11 percent of Negro student[s], racial balance can be achieved easily. Right now they are concentrated into six schools. A more integrated system is most effective.

YBE Exh. 16–21 at 1, 4; *see also* Transcript of Trial Proceedings Dated April 20–21, 26–28, May 2–4, 9–12, 16–18, 23–25, 1994 ("Tr.") 387–89 (Siragusa).

During the years 1970–80, the SED formed a clearer picture of the segregative conditions in the Yonkers schools. In June, 1970, Commissioner Ewald B. Nyquist wrote Charles Curran, President of the YBE, that nearly one-fourth of the schools in Yonkers were at a 10% or greater variance from the district-wide average number of minority group students; Nyquist then reminded Curran of the Board of Regents' "recommendation" that student bodies reflect a cross-section of the entire school district, and requested that Curran report within one month on the steps being taken to eliminate segregation. YBE Exh. 16–32. In 1971, Yonkers was recognized as a potential "trouble-spot" that could benefit from "action" to reduce racial imbalance. YBE Exh. 16–44 at 4. When SED staff went to work on a comprehensive plan for school desegregation, pursuant to which the State would intervene in school districts exhibiting racial imbalance, Yonkers appeared as the second priority on a list of districts to be addressed. YBE Exh. 16–62.[3] When the SED was working with a task force in Yonkers to facilitate funding for school desegregation during the years 1975–76, it acknowledged that "Yonkers is the fourth largest district in the State. It is substantially segregated." YBE Exh. 16–71 at 2; *see also* Deposition of Leroy L. Ram-

---

**3.** "There is serious imbalance in this district," wrote one SED staff member, "with almost two-thirds of the schools out of balance." YBE Exh. 16–46B.

sey, Dated May 3, 1990 ("Ramsey Dep."), at 29–31, 42. Finally, Gordon Ambach, Commissioner of Education from 1977 to 1987, testified that he had continuing knowledge while Commissioner of the racial imbalance in the Yonkers schools. Tr. 1447 (Ambach).[4]

In addition to knowing that segregation existed in the Yonkers schools, the SED can fairly be charged with knowing that Yonkers, if left to its own devices, was not going to remedy the segregation voluntarily. As will be discussed more fully below, there were two moments when self-initiated reform from within Yonkers seemed possible: the period 1970–71 and the period 1975–1978. In both instances, local residents in Yonkers opposed local reform; in both instances, the local reform impulse petered out; and in both instances, SED personnel were aware that no progress had been made. *See* YBE Exhs. 16–36; 16–46B at 29; Sobel Dep. at 121–27, 181–83, 191; Ramsey Dep. at 58–60, 80–84; Tr. 1448–49, 1453 (Ambach). While SED personnel may have hoped that Yonkers officials would make a "real demonstration of good will and effort" in a desegregation campaign, YBE Exh. 16–46B at 29, they had hard evidence before them indicating that such cooperation would not be forthcoming.

The closer question regarding the extent of the State's knowledge is whether the State was aware of the fact that the segregation in the Yonkers schools was *de jure* rather than *de facto*. The State clearly knew that the Yonkers schools were segregated; but did it know that the segregation was due to the intentional segregative practices of Yonkers officials? Several former State education officials testified that they themselves did not have such knowledge. Ramsey Dep. at 65–66; Tr. 1468 (Ambach). Indeed, it was suggested that State education personnel generally did not inquire into whether any given instance of school segregation in New York was *de facto* or *de jure* because they did not need to know: it was thought that the segre-

gation of students along racial lines deserved to be combatted whatever its cause, since it posed an inherent threat to the quality of elementary and secondary school education. Ramsey Dep. at 65–67; *see also* YBE Exh. 4–15, "Special Message From the Commissioner," Dated June 14, 1963 ("Public education in such a situation [of racial segregation] is socially unrealistic, blocking the attainment of the goals of democratic education ... *whether the situation occurs by law or by fact* ") (emphasis added). It is also to be noted that the statistics relied upon by the SED to inform itself of the racial composition of individual schools and districts, *see supra* note 4, apparently did not disclose the cause of the racial breakdown. Tr. 2724–25 (Griffith).

Nevertheless, the Court finds that the State defendants were aware of circumstances that should have alerted them to the likelihood that Yonkers had a substantial problem of unlawful segregation in its schools. The Court further finds that if in fact the State defendants were not so alerted, it was because they themselves chose to remain ignorant.

To begin with, SED officials knew that *de jure* segregation had been found to exist in New York State in the past, and that it was therefore not unthinkable that it should exist there again at some point. *See* YBE Exh. 3–8c at 4, "A Review of the Recent Legal History of School Desegregation as Prepared by the Office of the Counsel, New York State Education Department," Dated September 12, 1969 ("[O]ne Court found that the New Rochelle school district in our own State was acting unlawfully when it gerrymandered attendance zone lines so as to perpetuate a high degree of racial imbalance...."). There is also evidence that SED officials were aware as early as the mid–1970's that there was a substantial overrepresentation of minority students in Yonkers special education classes—a state of affairs that could

---

4. The State was kept informed of the segregative conditions in the Yonkers schools primarily by virtue of statistical information depicting the racial composition of school districts and particular school buildings which the SED required local school personnel to submit. *See, e.g.,* Deposition of Stanley C. Campbell, Dated November

28, 1990 ("Campbell Dep."), at 37–38; Ramsey Dep. at 22–26; Deposition of Morton J. Sobel, Dated April 17, 1990 ("Sobel Dep."), at 176; Tr. 61–62 (Sheldon). These "racial censuses" began in 1966 and continued annually thereafter. YBE Exh. 16–50 at 2.

hardly be explained by the usual adventitious factors, such as housing patterns, which produce *de facto* segregation and which are constitutionally neutral. *See* YBE Exhs. 16–60 at 7; 16–85; 17–20 at 3; Campbell Dep. at 74–77; Ramsey Dep. at 67–69; Tr. 1008–13, 1066–67 (Batista); Tr. 1760–63, 1774 (Cox–Gerlock).[5] Finally, there is evidence that some SED staff knew during the mid-to-late 1970's that Yonkers was planning to build subsidized housing in a way that would aggravate segregation. *See* Sobel Dep. at 223.

Yet, despite these various warning signals, there is no evidence that SED officials ever took any steps to investigate the causes of racial segregation in the special education classes, or, for that matter, the causes of the increasing segregation in the regular classes. The Regents, for one thing, appear to have studiously avoided discussing the issue of school segregation after about 1975. *See* Tr. 920–21 (Keyes); Tr. 2421–23 (Carr); Tr. 2625, 2627–28 (Griffith); Tr. 2782–83 (Genrich). And the sole inquiry that is documented in the record—a report by SED Counsel Robert Stone to Commissioner Ambach in 1980 on whether *de jure* segregation on the basis of race existed in any school district in New York—was superficial and did not represent a serious inquiry into whether *de jure* segregation existed in New York schools or not.[6]

On the whole, the Court finds that State education officials chose to assume that the segregation they were tracking in Yonkers was *de facto* rather than *de jure*, and that they chose to make this assumption not only without any positive foundation for it but in the face of actual conflicting evidence relating to special education and subsidized housing construction. Moreover, we find no basis

in the record for the suggestion that it was the State's commitment to the cause of rooting out all segregation, whatever its type, which made it blind to the actual causes of the segregation in the Yonkers schools.

In sum, the Court finds that the State knew about the segregation that existed in the Yonkers Public Schools, knew that Yonkers would not on its own take the steps necessary to end the segregation, and either knew or reasonably should have known that the segregation was *de jure* rather than *de facto*.

**2. *What the State Had the Power to Do***

The next question is: given its (actual or constructive) knowledge of illegal racial segregation in the Yonkers schools, what, if anything, could the State do about it? The answer is: a great deal. New York law has prohibited *de jure* segregation since 1900. *See* N.Y.Educ.L. § 3201(1) (McKinney 1995). As early as 1960, the New York State Board of Regents issued a policy statement urging school districts to take the steps necessary to end *de facto* desegregation in New York's public schools. YBE Exh. 3–1. The Regents reaffirmed that position in a series of subsequent racial integration policy statements. *See* YBE Exhs. 3–7; 3–12; 11–17; 17–44. These policy statements could have been enforced by the Commissioner in several different ways.

Section 306 of the Education Law, for example, invests the Commissioner with the authority to remove school officials who fail or refuse to comply with "any decision, order, rule or regulation of the regents or of the commissioner...." N.Y.Educ.L. § 306(1) (McKinney 1988). The Commissioner also has the authority under this provision to withhold state financial aid from an offending

---

**5.** Racial segregation in the special education classes was one of the unlawful conditions in the Yonkers schools that federal authorities found to exist, and decided to prosecute, in 1980. *See* YBE Exh. 17–120 at 3.

**6.** Commissioner Ambach had requested Stone to report to him on whether *de jure* segregation existed in any educational institution in New York. YBE Exh. T. Stone responded with the conclusory statement:

 I assume that the ... reference to *de jure* segregation relates to segregation on the basis

of race, color or national origin, and does not relate to segregation or distinctions based on such other factors as age or sex.

 Based upon that assumption, and since *de jure* of course means arising out of a legal requirement, I think we can say with confidence that *de jure* segregation on the basis of race, color or national órigin does not exist in any school district or educational institution in this State.

YBE Exh. U.

school district. *Id.* § 306(2). Although the calls for local action made in the Regents' racial integration policy statements did not amount to "orders," "rules," or "regulations," *per se*, testimony given at trial indicated that they could in fact have served as the basis for § 306 sanctions against non-complying school districts. *See* Tr. 2255–56 (Stone); Tr. 2788–89, 2816–19 (Genrich).

In a similar vein, § 310 of the Education Law gives the Commissioner the authority to institute, either on his own initiative or at the behest of a private citizen, quasi-judicial proceedings designed to enforce State education policies.[7] Such policies would undoubtedly include the objectives enunciated in the Regents' racial integration policy statements. *See* Tr. 2236–39 (Stone); Tr. 2819 (Genrich).

As a third option, the Commissioner and the Regents could have taken a regulatory approach to the problem of continuing segregation in the schools. That is to say, the Commissioner and the SED, working with the approval of the Regents, could have issued regulations requiring school districts to develop and submit plans for desegregating their schools, and could then have set up an enforcement apparatus consisting of site visits and compliance reports to ensure that such plans were in fact being carried out. *See* Tr. 2248–51, 2261–62 (Stone); Tr. 2781 (Genrich) (the Regents looked to the Commissioner to instruct school districts to develop desegregation plans within a certain time frame).

As a fourth option, the Commissioner could have used his authority under § 408 of the Education Law to ensure that the building or purchase of new school facilities by local districts advanced the goal of school desegregation, rather than hindered it. Section 408 provides that before any school building may be constructed or purchased, the plans and specifications for it must be submitted to and approved by the Commissioner. N.Y.Educ.L. § 408(1) (McKinney Supp.1995). The Commissioner is not to grant such approval, however, unless the plans submitted reflect "reasonable consideration" of the manner in which the proposed school fits into "a comprehensive, long-term school building program." *Id.* § 408(3) (McKinney 1988). No reason was offered by the State defendants as to why the Commissioner could not have taken the position that new school proposals that did not further desegregation did not fit well into "a comprehensive, long-term school building program," and should therefore not be approved.

Finally, as a fifth option, the Commissioner and his staff could have adopted the time-honored strategy of using the carrot rather then the stick: they could have recommended to the legislature that funding proposals for the benefit of local school districts be made contingent upon the adoption of desegregation programs.[8]

---

7. Section 310 provides in pertinent part:

> Any party conceiving himself aggrieved may appeal by petition to the commissioner of education who is hereby authorized and required to examine and decide the same; and the commissioner of education may also institute such proceedings as are authorized under this article.

N.Y.Educ.L. § 310 (McKinney 1988).

8. It is important to note that these supervisory and enforcement options are not recognized as such merely as a matter of hindsight, but rather were available to the State at the time of the events in question in this litigation. For example, in the early 1970's, when the SED was considering a plan of proactive intervention in districts exhibiting a high degree of racial imbalance, one SED official had this to say about the Commissioner's § 310 powers:

> Strictly speaking the Department [*i.e.,* the SED] has not *initiated* action in individual school districts. Formal Department action of the kind that results in a Commissioner's order to a district to develop a plan for correcting racial imbalance has always come as a result of an appeal to the Commissioner by citizens of a school district.... It is true that Section 310 does provide for the Commissioner himself instituting hearings in which a district would be required to show cause why it does not correct racial imbalance. The use of this provision of the Law is, of course, a possibility: whether or not it will be used has not been decided at this point.

YBE Exh. 16–44 at 5 (emphasis in original); *see also* YBE Exhs. 16–50 at 4; 16–62 at 4. One of the racial integration policy statements issued by the Regents endorsed the idea of State initiative in desegregation matters by putting squarely on the State the responsibility of stepping in and imposing remedial measures in the event that local officials failed to act. *See* YBE Exh. 3–7, "Integration and the Schools: A Statement of Policy and Recommendations by the Regents of the University of the State of New York," at 12

The State's position, as we understand it, is that while State educational officials may *nominally* have had the power to force local school districts to desegregate, they were for all practical purposes precluded from using that power. It was suggested at trial, for instance, that withholding general state financial aid under § 306 was an indiscriminate approach to a discrete problem which would have harmed the very children the desegregation policies were meant to help. Tr. 1428–31 (Ambach); Tr. 2194–95, 2197–99 (Stone). It was argued that the Commissioner was in a poor position to initiate proceedings *sua sponte* under § 310 (as opposed to ordering a proceeding in response to a private citizen's complaint) because (1) there did not exist a publicly announced set of criteria and standards as to exactly what constituted unacceptable racial segregation in the schools; the Commissioner would consequently have no prescriptive basis on which to issue a § 310 order; and (2) there did not exist a record of the particular case as prepared by private parties; the Commissioner would consequently have no factual basis on which to issue a § 310 order. YBE Exh. 14–34; Tr. 2206–07, 2238, 2261 (Stone). It was argued that the State could not develop and apply a uniform set of regulations in the desegregation context because the physical and demographic uniqueness of each school district compelled a tailor-made approach.

Tr. 1392–93 (Ambach); Tr. 2207 (Stone). Finally, it was suggested that the State undertook careful monitoring and enforcement actions only when the State was administering the expenditure of federal funds. *See* Tr. 1057–60 (Batista).

We reject this entire line of argument. None of these alleged obstacles to State enforcement action is more than a rationalization to justify inaction. The withholding of general state financial aid from disobedient school districts was perhaps too strong a deterrent, but the State had threatened at least one school district with it in the past—ironically, Yonkers—and with considerable success.[9] Had the Commissioner chosen to proceed *sua sponte* under § 310, he would have labored under no disadvantage or difficulty that he did not already face in the § 310 proceedings he routinely brought at the request of private citizens. The measure of acceptable levels of integration would have been exactly what it was in the non-*sua sponte* cases, that is, the Regents' racial integration policy statements, Tr. 2236, 2238–39 (Stone); and, guided by the statistics annually collected by the SED, the Commissioner would have had all the information he needed to determine whether a given school district exhibited an unacceptable degree of racial imbalance. *See supra* note 4.[10] As for the feasibility of general regulations in the desegregation context, it was conceded at trial

("Where the solution to the problem [of racial integration in the schools] is beyond the capability of the local school districts, or where a district fails or refuses to act, then the responsibility for corrective action is clearly and inescapably that of the State."). And, when Gordon Ambach began his tenure as Commissioner of Education in 1977, he told the SED staff that, with regard to racial integration, "[w]here local district action lags or is outside legal obligation, our responsibility is to assure [that] the rights of all persons are protected fully." YBE Exh. 14–44 at 7.

9. In the mid–1950's, a number of Yonkers citizens complained to State education officials that the Yonkers schools were being neglected and inadequately funded. After considering the citizens' appeal, then-Commissioner Wilson concluded that:

[i]t is quite evident that as Commissioner of Education I am not justified in apportioning public moneys to any community if it fails to carry out its own obligations in the way of providing instructional services for its chil-

dren. The situation at Yonkers will need to be resolved to the extent that I am satisfied that it is proper for me to continue to apportion public moneys to such district. . . . The [Yonkers] Board of Education will be required to submit to me before January first next sufficient evidence of an adequate program, both in respect to its education offerings and its building needs for the ensuing year, which would justify me in making an apportionment for such year.

YBE Exh. 2–3 at 1. When Yonkers showed an intention to comply with the State's recommendations for improving its school system, the State withdrew its threat to cut off state aid. *Id.* at 4.

10. In citizen-instigated and *sua sponte* § 310 proceedings relating to desegregation, the burden is simply to establish the existence of racial imbalance in the challenged school district, not to establish the cause of the imbalance. Tr. 2239 (Stone). The statistical data the SED routinely collected would therefore have provided the Commissioner with an adequate factual basis on which to proceed.

that State regulations oftentimes require schools districts to prepare plans for dealing with educational conditions that vary from district to district. Tr. 1506–07 (Ambach); *see also* Tr. 2250 (Stone). There is no reason to believe that the State could not have issued regulations requiring each school district, including Yonkers, to submit a plan detailing the racial makeup of its school population and outlining the steps it planned to take to remedy any unacceptable imbalance. Indeed, in 1963, then–Commissioner Allen effectively did just this, albeit in the form of a letter rather than a regulation. YBE Exh. 4–15. Finally, the record shows that the State has not hesitated to intervene in local school districts in instances where only state money is involved. *See* Tr. 1626 (Raymond) (state intervention in the area of physical education); Tr. 1768 (Cox–Gerlock) (state intervention in the area of guidance). The record does not support the State's claim that intervention occurred only when the State was monitoring the expenditure of federal funds.

By all accounts, the SED is one of the most activist state educational bodies in the country. *See, e.g.,* Tr. 1773 (Cox–Gerlock). It vigorously monitors and regulates many different aspects of education, including special education, bilingual education, vocational training, achievement scores, dropout prevention, and school building construction. Contrary to the defendants' characterization, the SED has not subscribed to what one might call a "laissez-faire" approach to educational oversight. When, for example, a fatal football accident occurred in Yonkers, the State's interest, involvement, and presence were prompt and keenly felt. Tr. 1618–24 (Raymond). To argue, then, that when it came to enforcing its own school desegregation policy, the State somehow came up short in supervisory authority, is singularly unpersuasive.

The Court finds that the State had several effective means for compelling local compliance with its racial integration policy during the years at issue in this litigation. If the State did not in fact force compliance, it certainly was not because it lacked the authority or practical power to do so.

### 3. *What the State Did (or Did Not Do)*

From the moment in the late 1960's that the State became aware that conditions of racial imbalance were developing in the Yonkers schools, it was in a position to require Yonkers to undertake remedial measures. It never took advantage of that position. The State never threatened to withhold state financial aid from Yonkers or to remove those Yonkers school officials who opposed efforts to integrate the Yonkers schools; it never initiated *sua sponte* a § 310 proceeding designed to investigate and remedy the segregative conditions in the Yonkers schools; it never wrote regulations addressing the issue of school desegregation; it never directed Yonkers officials to consider the segregative impact of new school construction or acquisition before approving their submitted plans and specifications; and, it let pass opportunities to condition state aid to the schools on local desegregation efforts, *see, e.g.,* YBE Exh. 14–7; Tr. 1528–32 (Ambach). The State did not, in short, require anything of Yonkers in the area of school desegregation. The one instance in which State education officials seemed prepared to intervene affirmatively in Yonkers and organize and/or compel desegregation efforts was in 1971–72, when Commissioner Nyquist put his staff to work on a "master plan" for desegregating the most racially imbalanced school districts. *See* YBE Exhs. 16–46(A), (B), (D), (E); 16–50; 16–62. The master plan never materialized, however; it was shelved for lack of State funding. Tr. 178–79 (Sheldon).

Rather than act, the State waited. It waited for private citizens in Yonkers to invoke the State's help by filing § 310 petitions, *see* Ramsey Dep. at 89; Tr. 1451–55 (Ambach), but no petition was ever filed. It waited for Yonkers to make voluntary efforts to desegregate its schools, and asserts that it stood ready with offers of money and technical assistance to aid such efforts. Ramsey Dep. at 90–91, 93–94; Tr. 1454 (Ambach). But it never forced the issue. When, for example, the Yonkers education community appeared ready in 1970–71 to take steps to end the segregation in the schools, YBE Exh. 17–17, the SED dispatched staff member Morton

Sobel to talk to the local PTA groups. Sobel's message was relatively soft: Yonkers is a segregated district; segregation is not good for children; it is up to you to do something about the condition in your schools. Sobel Dep. at 187–88; Tr. 404–05 (Siragusa). When Yonkers did nothing about the condition in its schools, the State dropped the issue. *See* Sobel Dep. at 191–93; Tr. 190 (Sheldon).

In the fall of 1975, when the Yonkers education community again showed an inclination to undertake reforms, the State reappeared on the scene. This time, however, it could not even deliver on its promise to provide meaningful financial aid for the local reform effort. YBE Exhs. 17–79; 17–81; Tr. 348 (Ross); Tr. 1155–56 (Jacobson). And, when this second effort ultimately fizzled out in 1977–78, in no small part due to the State's failure to contribute funds, the State once again said and did nothing. *See* Ramsey Dep. at 92–94; Tr. 1448–52 (Ambach).

Not even when the federal government intervened in Yonkers in 1980, alleging violations of the federal civil rights laws, did the State seek to hold Yonkers accountable for its long-standing violation of the State's school desegregation policy. Tr. 1634 (Raymond). The most the State did was to offer to procure federal funding for Yonkers to help pay the cost of ·complying with the federal desegregation order, and to provide technical assistance in the development of a desegregation plan. Defendants' Exh. XX; YBE Exh. 17–131; Ramsey Dep. at 82–83. When the YBE ultimately decided to fight the federal order, the State withdrew these offers of aid, YBE Exh. 17–134, and was not heard from in the matter again. The State even let pass an opportunity to cajole Yonkers into complying with the federal desegregation order when, in 1984, it refused to condition its financial bailout of Yonkers on the City's ratification of a consent decree with the federal government. *See* YBE Exh. 17–156; Tr. 1632–33 (Raymond).

In sum, with all of its authority and knowledge of the segregative conditions in the Yonkers schools, the State essentially adopted a wait-and-see attitude. It asserted a willingness to help Yonkers help itself, but it would not force Yonkers to change. Thus it occurred that in Yonkers, where local support for desegregation was minimal and no citizen-initiated § 310 proceeding was ever commenced, desegregation simply did not take place until it was compelled by order of the federal court.

At this point, it is important to make clear what factual findings the record *does not* support. There is no evidence that State education officials ever undertook affirmative actions to preserve segregation in the Yonkers schools, or that they indicated to anyone in Yonkers, either tacitly or otherwise, that they thought that segregation in the schools should be preserved. There is no evidence that State education officials ever actively impeded Yonkers officials from taking steps on their own to remedy the school segregation. There is no evidence that State education officials ever communicated to anyone in Yonkers that they would purposefully "look the other way" should Yonkers decide to continue to be in violation of State desegregation policy. There is no evidence that State education officials ever adopted a policy that indicated specific approval of the manner in which Yonkers was managing the racial makeup of its schools. Finally, there is no evidence that, had a Yonkers citizen filed a desegregation § 310 petition, the State would not have responded to that petition promptly and fairly. Indeed, the record supports the finding that the Commissioners of Education in most instances enforced the racial integration policy in connection with proceedings brought before them by private citizens under § 310.[11]

### 4. Why the State Did Not Intervene in Yonkers

The State exhibited a determined reluctance to enforce its own desegregation policy in Yonkers, and a significant portion of the trial was devoted to an inquiry into why that was so. The Court accepts in large part the plaintiffs' explanation, which is that race-

---

**11.** The State made serious efforts to inform the Yonkers public as to how a private citizen or citizens' organization could trigger a State investigation under § 310. *See, e.g.,* YBE Exh. 17–49 at 1.

based political opposition to integration throughout New York State eventually exerted enough pressure on the Regents and on SED officials as to cause them to become cautious and reactive on the issue of desegregation.

During the 1960's and early 1970's, State education officials actively set about to bring an end to the racial imbalance that existed in the New York public schools. The Regents strongly endorsed school desegregation in the racial integration policy statements of 1960, 1963, 1968 and 1972. YBE Exhs. 3–1; 3–2; 3–7; 3–12. The SED, under Commissioner Nyquist, did not hesitate to enforce the racial integration policy in connection with § 310 appeals from private citizens. In each of these proceedings, Commissioner Nyquist found that de facto segregation existed and sought to institute remedial measures. Moreover, the SED under Nyquist took steps to formulate a comprehensive plan of affirmative state intervention in school districts that exhibited a high degree of de facto segregation. YBE Exhs. 16–46(A), (B), (D), (E). The activist tenor of the SED's position during these years is perhaps best captured in a report on State integration initiatives written by an SED staff member in 1972. Concerning the Albany school district, the staff member wrote, "[n]o citizen has ever appealed for the correction of racial imbalance, but Albany should not for that reason be neglected." YBE Exh. 16–50 at 4.

By 1969, however, opposition to non-voluntary means to achieve racial integration in the schools—and to racial integration itself—had swelled to the point where the New York State Legislature enacted Chapter 342, a law that prohibited State education officials, as well as local school districts with appointed school boards, from assigning students for the purpose of achieving racial balance or of taking other desegregative actions. Although the statute was ultimately declared unconstitutional, as violative of the Equal Protection Clause, see Lee v. Nyquist, 318 F.Supp. 710 (W.D.N.Y.1970) (three judge

court), aff'd, 402 U.S. 935, 91 S.Ct. 1618, 29 L.Ed.2d 105 (1971), the attitude of the State Legislature was clear. Indeed, even after Chapter 342 was struck down, the Legislature continued to debate and pass bills and resolutions that were similar to Chapter 342 in their purpose and intended effect. See, e.g., YBE Exhs. 7–21(A)–(E); 7–22; 7–28; 7–37.

Following the invalidation of Chapter 342, the State took measures that had the cumulative effect of undermining efforts to reduce school segregation. In 1971, the Legislature eliminated the Racial Balance Fund, which was the source of funding to assist communities in undertaking the expensive task of desegregating their schools, and refused each year thereafter to reinstate the Fund despite annual requests to do so from State education officials. The elimination of the Fund deprived State officials of one of the few positive inducements they had to encourage local acts of desegregation, and thereby weakened their efforts to implement the Regents' racial integration policy. YBE Exh. 16–62 at 2; Campbell Dep. at 43–45; Tr. 90–91 (Sheldon).

Changes were also taking place in the composition of the Board of Regents due to the accession to the Board of new Regents, interviewed prior to appointment by legislators (a new practice), who were known to be hostile to vigorous desegregation efforts.[12] In February, 1974, a law was passed that shortened the Regents' term of office from fifteen to seven years in order to make them more "accountable" to elected officials and their constituents. YBE Exh. 10–13; Tr. 2545 (Griffith). In the summer of the same year, the Regents, prodded by criticism of Commissioner Nyquist's vigorous desegregation efforts, see, e.g., YBE Exh. 10–15, undertook a reexamination of their 1972 racial integration policy statement. That reexamination resulted in revised policy statements that diluted the pro-desegregation force of

12. In 1976, one New York State Senator refused to vote for a bill that was similar to Chapter 342 on the grounds that he had already taken the steps needed to stop forced busing by voting for the election of three new regents, "everyone of whom" was opposed to Commissioner Nyquist's § 310 efforts. YBE Exh. 7–37 at 79 (remarks of Senator Halperin).

the 1972 statement.[13] In at least two instances, individual Regents interceded in Commissioner Nyquist's § 310 proceedings to plead the case for less drastic desegregation orders. See YBE Exhs. 12–20; 12–21; Defendants' Exhs. 6H; 6I. And the Regents as a whole, out of a concern to rein in Nyquist's desegregation efforts, see YBE Exh. 12–25 at 1; Defendants' Exh. 6K at 1, 3, lobbied for legislation providing for stricter judicial review of the Commissioner's § 310 orders. YBE Exh. 12–71. That legislation became law in 1976.

Finally, in November, 1976, the Regents fired Commissioner Nyquist. The YBE and NAACP sought to prove at trial that he was fired because of his vigorous stance on integration, while the State argued that relations between Nyquist and the Regents had so deteriorated that his continued service was unacceptable. Indeed, there is ample evidence that Nyquist's dealings with some Regents was high-handed and offensive and that, to a considerable extent, he precipitated his own removal. In all, we find that the plaintiffs have not proven that Nyquist would not have been fired but for his views on integration. We do find, however, that his views on this subject were a substantial factor leading to his discharge.

In the years following Nyquist's removal, the furor over desegregation died down to a considerable extent. And with good reason: Nyquist's successor, Gordon Ambach, was not presented with any § 310 appeals from private citizens; and, in accordance with the practice of his predecessors, he did not initiate any § 310 proceedings sua sponte. Tr. 1412 (Ambach). With respect to the § 310 appeals he inherited from Commissioner Nyquist, there is evidence to suggest that Commissioner Ambach eventually issued orders that were less stringent, from a remedial standpoint, than the orders initially fashioned by Commissioner Nyquist. See Defendants' Exhs. C–27 & C–28 (Ambach extended by one year the time that the Rockville Centre

school district had to begin integrating its elementary schools; Nyquist had previously denied an extension); C–46 & C–47 (Ambach allowed Syracuse to delay the integration of three elementary schools).

There is little doubt in the Court's view that the State's gradual retrenchment from its once strong school desegregation policy, as just outlined, was motivated by a growing antipathy to desegregation on the part of the New York State Legislature. To be sure, the debate that was being conducted during these years was cast in terms of being for or against busing. The evidence is clear, however, that "busing" was a symbol for integration. Busing, after all, was common in many areas of the State for reasons having nothing to do with matters of race (e.g., for the purpose of school centralization programs). While there were those who raised good-faith questions as to the conditions under which busing should take place, the furor over busing per se cannot be explained on any non-racial grounds.

What is more, this growing antipathy to desegregation did not go unnoticed by the SED officials charged with promoting school desegregation. There was testimony, which the Court finds credible, that these SED officials regarded the Regents' revisions of the 1972 policy statement, their support of stricter review of the Commissioner's § 310 orders, and their firing of Commissioner Nyquist as part of an effort to retreat from the commitment to school desegregation. Campbell Dep. at 48–49, 101–02; Tr. 147–48, 212 (Sheldon); Tr. 884–86, 916–17 (Keyes). There was testimony that SED officials perceived the Legislature to be making appointments of Regents with the racial integration policy in mind. Tr. 108–09 (Sheldon). And, perhaps most importantly, there was testimony that these impressions on the part of SED officials had the effect of making them slow down and proceed more cautiously in their desegregation efforts. See, e.g., Tr. 916–19 (Keyes).[14]

13. The revised statements emphasized that desegregation efforts, such as the use of forced busing, should not be allowed to jeopardize the health and safety of children, see YBE Exh. 11–17, and that the use of quantitative measures

(i.e., quotas) was not the sole or even principal means for detecting and correcting school segregation. YBE Exhs. 3–14; 17–44.

14. There is no evidence that the Legislature or the Regents ever made any efforts to communi-

To sum up: the State had the power to act in support of school desegregation in Yonkers, but it lost the will to act. And it lost the will to act for the simple reason that its once touted principles of racial equality in the schools had become politically untenable.

### 5. *The Effect on Yonkers of the State's Failure to Intervene*

The State's failure to intervene in Yonkers impacted the City in several ways. The most obvious impact, of course, is that Yonkers was not forced to desegregate its schools. There is every reason to believe that had the State brought its coercive powers to bear in Yonkers, Yonkers would have complied with its directions. *See* Deposition of Gerald L. Freeborne, Dated October 30, 1990, at 103;[15] Tr. 1625–28 (Raymond); Tr. 2249 (Stone); Tr. 2784 (Genrich).

The second impact on Yonkers was more subtle, but equally real. There is evidence that when the State failed to intervene in Yonkers, either coercively or by way of positive inducements, it altered the balance of power between the forces in Yonkers favoring reform and the forces in Yonkers opposing reform. For example, the response to SED official Morton Sobel's rather tepid call to action in 1971 (recounted *supra* p. 224) was a "mixed bag":

> There were people that were delighted that they didn't have to deal with the issue [of desegregation], that it seemed as though it wasn't imperative. There were others that were very disappointed such as I was that we didn't get more specific information from him regarding help. Both ends.

Tr. 405 (Siragusa).

In October, 1975, the YBE authorized the formation of a task force to develop a plan for desegregating the Yonkers schools. The task force urgently requested financial aid from the SED, YBE Exhs. 17–54; 17–68; 17–71, and the SED quickly promised roughly $80,000 in funding. However, the SED was unable to furnish any money until May, 1976, and then only $13,000. YBE Exhs. 17–56 at 2; 17–81; Tr. 303–05, 307, 344 (Ross). This lack of funding hindered the efforts of the task force, Tr. 1138 (Jacobson), and delayed the presentation of its recommendations to the YBE. And this delay, in turn, enabled opposition to the reform efforts to coalesce to a point where the YBE became hostile to the very desegregation initiative it had originally commissioned. Tr. 313–14, 321–22 (Ross); Tr. 439–41 (Siragusa).

Finally, in 1978, when the Yonkers community was considering the desegregation plan of then–Superintendent Joseph Robitaille, an influential Yonkers taxpayers association that opposed the plan had the following to say about the possibility of State intervention should the plan be rejected:

> The State Department of Education is the other governmental agency able, by means of funding, to force an integration plan on the school board. This agency, however, after going through a period marked by particularly zealous integration directives, is modifying its approach. Last spring, the former commissioner of education Ewald Nyquist, was dismissed because of his singleminded pursuit of desegregation throughout the state by busing and other means whether or not warranted. It is now obvious that the Board of Regents is taking a more cautious view of integration cases and directives.... It is clear that busing for integration purposes is out of favor even at the state level, and that there is very little likelihood that the commissioner [Ambach] would mandate a forced busing program on the city of Yonkers....
>
> [We] therefore again recommend[ ] that the Board of Education reject [Superintendent Robitaille's plan] without being intim-

---

cate to SED officials that, despite appearances to the contrary, they continued to support vigorous desegregation efforts.

**15.** "Q.: With respect to the state requirements[,] if a school district wasn't in compliance with state requirements, did that lead to some direct action by the state to bring them into compliance

or was there some recognition, well, we have these requirements, not everyone has to follow them?"

"A.: Where a problem was identified, they would be told to correct the situation, and I can't think of an instance where it was not corrected once the problem was identified."

idate[d] by fear of federal or state agency sanctions.

YBE Exh. 17–113 at 4.

As is evident from this passage, there was a public perception in Yonkers that Commissioner Nyquist's termination came as a result of his pro-integration stance. This perception added to the widespread belief that the State would not aggressively address the problems in the Yonkers schools or elsewhere in New York. And, whether accurate or not, this belief bolstered those in Yonkers who hoped that the State would in fact leave Yonkers alone.[16]

## B. *Housing*

The New York State Urban Development Corporation ("UDC"), established by the New York State Legislature in April 1968, was perhaps the most powerful state housing and development agency ever created. Tr. 1249–51 (Danielson). Combining functions, such as housing finance and project development, that were formerly performed by separate entities, the UDC was also given the unprecedented authority to override local building and land use controls and to exercise powers of eminent domain. YBE Exh. 6–9 at § 16; Tr. 754 (Hayden); Tr. 1252 (Danielson).

Headed by president and chief executive officer Edward Logue, the UDC was run by a staff of enthusiastic and idealistic persons dedicated to the creation of fair housing. Deposition of Edward J. Logue, Dated December 13, 1991 ("Logue Dep."), at 26, 29, 52, 153; Tr. 753–54 (Hayden). There is and can be no serious allegation that the UDC staff had a malicious desire to further racial discrimination in Yonkers or elsewhere.

UDC was initially invited by local officials to become active in Yonkers when that City was faced with the threat by Otis Elevator Company, a major employer and economic presence in Yonkers, that it would move away from Yonkers unless it could expand its existing plant. Otis plant expansion required the relocation of significant numbers of persons, primarily minority members, for whom housing accommodations within Yonkers had to be created. *See Yonkers Board,* 624 F.Supp. at 1317; Logue Dep. at 79; Tr. 735 (Hayden).[17]

The UDC embarked on this task with enthusiasm, initially pushing for "scattered site" housing throughout the City of Yonkers.[18] Logue Dep. at 135; Tr. 760 (Hayden); Tr. 815 (Morris); Tr. 1163 (Galgano). For example, a list of possible sites referred by the UDC to City officials in June, 1969 contained eleven locations in different parts of the City. *See Yonkers Board,* 624 F.Supp. at 1317; YBE Exh. 19–36; Tr. 562 (Pistone). However, the UDC was soon made aware of strong local opposition to the building of subsidized housing in the predominantly white areas outside of Southwest Yonkers. *See Yonkers Board,* 624 F.Supp. at 1317–18. The UDC clearly had at least some knowledge that this opposition was race-based. Tr. 539 (Pistone); Tr. 694 (Gibson); Tr. 753, 762 (Hayden); Tr. 853 (Morris); Tr. 1281–82 (Danielson).

We find that the UDC, confronted with this race-based community opposition and concerned about the political feasibility of scattered-site housing, made a determination not to exercise its statutory override powers, which would have enabled it to proceed without local approval.[19] Tr. 696 (Gibson); Tr.

---

**16.** As was the case with SED officials who entertained a similar belief, the State made no serious effort (such as by a statement from the Board of Regents itself) to dispel the notion that the State had ceased to be committed to school desegregation. *See, e.g.,* Tr. 2383–87 (Kendall); 2609–11 (Griffith). The Regents can be charged with knowledge of the public's impression of State retrenchment on desegregation matters because of the news clippings from around the State which they regularly received and reviewed. *See* Tr. 2384 (Kendall); Tr. 2553–54 (Griffith).

**17.** Ultimately, Otis Elevator rejected proposals to stay in Yonkers and opted to move out. *See* 624 F.Supp. at 1319.

**18.** "Scattered site" housing refers to housing that is geographically distributed in different neighborhoods, as opposed to housing concentrated in low-income, heavily minority areas. *See, e.g.,* Deposition of Gerald Lenaz, Dated May 18, 1983 ("Lenaz Dep."), at 97.

**19.** In addition to using its override powers to achieve scattered-site housing despite community opposition, the UDC could have used the threat

762 (Hayden); Tr. 1281–83, 1288–89 (Danielson). Between 1969 and 1975, the UDC sponsored 1,200 of the 2,600 units of subsidized housing for families approved and opened in Yonkers. *See Yonkers Board,* 624 F.Supp. at 1313.[20] These units, as well as those in two senior citizens projects built during the same period, were concentrated in the Southwest region of the City. *Id.* This Court has previously found that the concentration of new housing in Southwest Yonkers worsened the already segregated state of housing and schools in the City. *Id.* at 1364, 1500.

During and after 1973, various factors threatened the financial stability of the UDC and increasingly curtailed its housing program. YBE Exh. 6–62. The precipitating event was the federal government's moratorium on all new federal housing subsidy commitments under section 236 of the National Housing Act, upon which the UDC had become highly dependent. Defendants' Exh. ZZZ; YBE Exh. 6–48 at 8; Logue Dep. at 63–64, 75, 178; Tr. 1271 (Danielson). This and other factors eventually led the UDC and its housing program into default. YBE Exh. 6–66 at 3. In 1975, the State bailed out the UDC and effectively ended its housing program. YBE Exh. 6–66; YBE Exh. 20–63 at ¶ 10; Tr. 1690–92 (Danielson).

The UDC advances several explanations for its determination not to exercise its statutory override powers in order to achieve "scattered site" housing. First, UDC representatives testified that one of their chief priorities was to build good housing promptly. Tr. 735–36 (Hayden). Their hope was that once the community witnessed the high quality of this initial housing, it would more readily accept additional housing. Tr. 695, 709, 720–21 (Gibson); Tr. 782–83 (Hayden). Second, the UDC maintains that the construction in fact undertaken was the most integrative subsidized housing ever built in Yonkers and was intended to be marketed

pursuant to a plan that would have resulted in an integrated tenancy. YBE Exhs. 20–9 to 20–12; Logue Dep. at 137, 142–44; Examination Before Trial of Marion Scott at 60–63, 168–69; Tr. 762, 799–800 (Hayden). Finally, witnesses testified that the construction in Southwest Yonkers was but the first phase of the UDC's intended activities in the City. Had the UDC's housing program not come to an abrupt and unforeseen halt, the UDC would have pursued its long term plans for scattered-site housing. Lenaz Dep. at 242, 275; Tr. 717–18 (Gibson); Tr. 781–82 (Hayden).

We accept as true the UDC's explanations for its actions. Nevertheless, we find that between 1969 and 1975 the UDC, regardless of its long-term plans or good intentions, knowingly acquiesced and indeed participated in the segregative site selections for which this Court has already found the City of Yonkers to be liable. *Yonkers Board,* 624 F.Supp. at 1376.

### III.

### CONCLUSIONS OF LAW

#### A. *Schools*

##### 1. *Sovereign Immunity*

As a threshold matter, the State has raised a number of issues relating to sovereign immunity which go directly to the Court's subject matter jurisdiction over the State defendants. As will be recalled from prior opinions in this impleader action, the plaintiffs allege that the State defendants have engaged in a continuing pattern of conduct contributing to segregation in the Yonkers schools in violation of, *inter alia,* the Fourteenth Amendment to the Constitution, Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.* (1988) ("Title VI"), and other civil rights statutes, 42 U.S.C. §§ 1981, 1983, 1985, and 1988 (1988). The State argues that none of these legal provisions furnishes a

---

of such an action as leverage in negotiating with local public officials to achieve the same result. *See* Tr. 1253 (Danielson) (describing the override power as "a bargaining instrument of very substantial potential."). However, there is little evidence that the UDC attempted even this lesser course of action.

20. The UDC approved these units pursuant to a Memorandum of Understanding entered into with the City in July, 1970 and amended in 1971 and 1972. YBE Exhs. 19–81; 19–113; 19–174.

basis for overcoming the sovereign immunity of the State of New York, its officials, and its agencies under the Eleventh Amendment.

 The State's claim for the most part fails. Apart from State defendant Mario Cuomo, *see infra* pp. 230–231, there exists no jurisdictional bar to suit against the individual State defendants (*i.e.*, the individual Members of the Board of Regents and the Commissioner of Education) and the Director of the UDC, all sued in their official capacities. It is by now well-established that the Eleventh Amendment does not bar suit in federal court against a state official for prospective injunctive relief to remedy a continuing wrong. *See, e.g., Milliken v. Bradley*, 433 U.S. 267, 289, 97 S.Ct. 2749, 2761, 53 L.Ed.2d 745 (1977); *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). In the context of school segregation cases such as this one, a "continuing wrong" exists as long as state officials fail or refuse to eliminate from the public schools all vestiges of segregation for which they are either partly or wholly responsible. *See, e.g., United States v. Fordice*, ── U.S. ──, ──, ──, 112 S.Ct. 2727, 2735, 2737, 120 L.Ed.2d 575 (1992); *Columbus Board of Educ. v. Penick*, 443 U.S. 449, 459, 99 S.Ct. 2941, 2947, 61 L.Ed.2d 666 (1979); *Milliken*, 433 U.S. at 289–90, 97 S.Ct. at 2761–62. Accordingly, should the Court conclude that the conduct of the individual State defendants prior to 1985 contributed to school segregation in Yonkers, and that these defendants have failed to remedy the segregation since 1985, the Eleventh Amendment would not bar an order requiring them to share the costs of eliminating those vestiges of segregation that continue to exist. And, once the Eleventh Amendment bar were removed, 42 U.S.C. § 1983 could clearly serve as an affirmative basis of legal liability. *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 n. 10, 109 S.Ct. 2304, 2312 n. 10, 105 L.Ed.2d 45 (1989).[21]

 As regards Mario Cuomo, sued here in his official capacity as (ex-) Governor of the State of New York, the Court agrees

with the State that he should be dismissed as a defendant because there does not exist a sufficient connection between him and the alleged wrongdoing. *See* State and UDC Defendants' Post–Trial Brief on Liability ("State Post–Trial Brief") at 12–17. As the Supreme Court explained in *Ex parte Young*, 209 U.S. at 157, 28 S.Ct. at 453:

> In making an officer of the state a party defendant in a suit to enjoin the enforcement of an act alleged to be unconstitutional, it is plain that such officer must have some connection with the enforcement of the act, or else it is merely making him a party as a representative of the state, and thereby attempting to make the state a party.

In *Gras v. Stevens*, 415 F.Supp. 1148, 1152 (S.D.N.Y.1976) (three-judge court) (Friendly, J.), the court applied this language to dismiss a § 1983 lawsuit against then-Governor Rockefeller on the grounds that the Governor's general duty to enforce state laws, *see* N.Y.Const. art. IV, § 3 (McKinney 1987), did not, without more, establish the necessary connection between him and the statute alleged to be unconstitutional. *See also Los Angeles Branch NAACP v. Los Angeles Unified School Dist.*, 714 F.2d 946, 953 (9th Cir.1983) (dismissing § 1983 school desegregation action against the Governor of California), *cert. denied*, 467 U.S. 1209, 104 S.Ct. 2398, 81 L.Ed.2d 354 (1984).

In the present case, the connection between Governor Cuomo and the alleged unconstitutional conduct of the State is too thin to conclude that he, independently of the State of New York, is a real party in interest. As the State points out, it is the Commissioner of Education's duty, not the Governor's, to enforce "all general and special laws relating to the educational system of the state...." N.Y.Educ.L. § 305(1) (McKinney 1988). The Governor has no role in the appointment of state education officials, *see* N.Y.Const. art. V, § 4 (McKinney 1987); N.Y.Educ.L. §§ 202(1) (McKinney Supp.1995), 302 (McKinney 1988); nor does he make general

---

**21.** "Of course a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because 'official-capacity actions for prospective relief are not treat-

ed as actions against the State.'" (quoting *Kentucky v. Graham*, 473 U.S. 159, 167 n. 14, 105 S.Ct. 3099, 3106 n. 14, 87 L.Ed.2d 114 (1985)).

policy recommendations for elementary and secondary school education. Rather, the Board of Regents has the responsibility of determining State educational policy, N.Y.Educ.L. § 207 (McKinney 1988), and the Commissioner has the responsibility of executing it. *Id.* § 305(1). Given this institutional structure, which distances the Governor of New York from involvement in educational affairs, it is perhaps not surprising that none of the factual allegations listed in plaintiffs' second amended complaint and amended answer directly implicates Governor Cuomo. Perhaps most importantly, plaintiffs have not indicated how the present Governor of New York would have the legal responsibility for implementing an order by this Court to eliminate the vestiges of past segregative acts by the State. *Cf. Pennhurst State School and Hospital v. Halderman,* 465 U.S. 89, 101, 104 S.Ct. 900, 908, 79 L.Ed.2d 67 (1984) (" 'The general rule is that relief sought nominally against an officer is in fact against the sovereign if the decree would operate against the latter' ") (quoting *Hawaii v. Gordon,* 373 U.S. 57, 58, 83 S.Ct. 1052, 1053, 10 L.Ed.2d 191 (1963) (per curiam)).[22]

In light of the foregoing, the Court concludes that it lacks subject-matter jurisdiction over this action as it relates to Governor Cuomo. He is, accordingly, dismissed as a defendant in this action.

■ The final sovereign immunity issue concerns whether the Eleventh Amendment bars suit against defendants State of New York, the SED, and the State Board of Regents.[23] The general rule, of course, is that the Eleventh Amendment is an absolute bar to suits brought in federal court against states and their agencies without either the state's express or implied consent or an express abrogation by Congress of the state's Eleventh Amendment immunity. *See, e.g., Pennhurst,* 465 U.S. at 99–101, 104 S.Ct. at 907–09.[24] The record before the Court does not include any consent, either express or implied, by the State of New York to permit this suit to proceed in federal court against itself or its agencies. The question remains whether Congress by statute has expressly abrogated the State's Eleventh Amendment immunity. (We say "by statute" because the Fourteenth Amendment, by its own force, does not override a state's Eleventh Amendment immunity. *See Santiago v. New York Dep't of Correctional Servs.,* 945 F.2d 25 (2d Cir.1991), *cert. denied,* 502 U.S. 1094, 112 S.Ct. 1168, 117 L.Ed.2d 414 (1992)).

■ The first point to be made is that, by enacting 42 U.S.C. §§ 1981, 1983, and 1985, Congress did not abrogate the state's Eleventh Amendment immunity. *Quern v. Jordan,* 440 U.S. 332, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979) (Eleventh Amendment immunity not abrogated by § 1983); *Rucker v. Higher Educ. Aid Bd.,* 669 F.2d 1179, 1184 (7th Cir.1982) (§§ 1981, 1985); *Davis v. Buffalo Psychiatric Center,* 623 F.Supp. 19, 20 (W.D.N.Y.1985) (§ 1981).

However, plaintiffs may proceed against the State and its agencies under Title VI. That statute provides, in pertinent part, that:

---

**22.** The plaintiffs did introduce at trial evidence indicating that Governor Cuomo played a role in the State's decision in 1984 not to condition its financial bailout of Yonkers on the City's acceptance of a consent decree with the federal government. *See supra* p. 224. We do not think, however, that the Governor is amenable to an order to provide prospective relief to the Yonkers schools simply because he may have purposely decided to forego a one-time instance of political leverage over Yonkers. This instance appears to have been an anomaly, in the sense that it brought a State official who normally had no direct involvement in educational matters into *ad hoc* contact with an educational problem.

**23.** The Second Circuit Court of Appeals has already decided that the UDC may not successfully assert the Eleventh Amendment as a defense to this action. *United States v. Yonkers,* No. 92–6198, slip op. at 3, 990 F.2d 623 (2d Cir. Jan. 13, 1993).

**24.** Whether the New York State Board of Regents can be classified as a State "agency" for Eleventh Amendment purposes appears to be a question of first impression in this Circuit. However, given that the Second Circuit has ruled that the State University of New York is itself an integral part of the government of the New York and partakes of the State's sovereign immunity, *see Dube v. State University of New York,* 900 F.2d 587, 594–95 (2d Cir.1990), *cert. denied,* 501 U.S. 1211, 111 S.Ct. 2814, 115 L.Ed.2d 986 (1991), we conclude that the University's governing body—the Board of Regents—enjoys sovereign immunity as well.

No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

42 U.S.C. § 2000d. Title 42 U.S.C. § 2000d–7 then provides:

(a) General provision

(1) A State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of ... title VI of the Civil Rights Act of 1964....

. . . . . . .

(b) Effective date

The provisions of subsection (a) of this section shall take effect with respect to violations that occur in whole or in part after October 21, 1986.

The State makes two main arguments with respect to the sovereign immunity implications of Title VI in this case. It first contends that because Title VI prohibits discrimination only by "any program or activity receiving Federal financial assistance," and because the State itself is neither a "program" nor an "activity," *see* 42 U.S.C. § 2000d–4a (1988), Title VI should be construed to repeal the sovereign immunity of state agencies but not the immunity of the states themselves.

■ We reject this argument. There is nothing in the terms of Title VI that indicates that an entity must be a "program or activity" if it is to be sued for a violation of Title VI. On the contrary, the plain language of § 2000d–7(a)(1) quite clearly provides that the Eleventh Amendment immunity of the state itself is abrogated, and it does not differentiate in any way between the immunity of the state and that of its instrumentalities. This plain-language meaning is arguably reinforced by the fact that Congress amended Title VI to make clear that the statute authorizes suit against an entire system for the discriminatory practices of a discrete program within that system receiving federal funds. *See* Pub.L.No. 100–259, § 6, 102 Stat. 28, 31 (1988) (codified at 42 U.S.C. § 2000d–4a); *Board of Educ. v. Georgia*, No. CV 490–101, slip op. at 15–16 n. 7 (S.D.Ga. Sept. 24, 1990). Moreover, nothing in the legislative history of Title VI compels the conclusion that an entity must be a "program" or "activity" to be a Title VI defendant. *See Association of Mexican–American Educators v. California*, 836 F.Supp. 1534, 1542–43 (N.D.Cal.1993) (reviewing the legislative history of Title VI and concluding that the State of California was a proper Title VI defendant). We therefore hold that the State of New York can be sued under Title VI as long as it, along with those of its agencies receiving federal financial assistance, is alleged to have been responsible for a Title VI violation.[25] *Accord id.* at 1543; *Board of Educ. v. Georgia*, slip op. at 15–16.

■ We also reject the State's argument relating to the Board of Regents' and SED's amenability to suit under Title VI. The State concedes that both of these agencies, "as 'program[s] or activit[ies] receiving Federal financial assistance' ... are proper defendants to a Title VI claim of discrimination occurring after October 21, 1986...." State Post–Trial Brief at 18. The State contends, however, that the evidence presented at trial

---

**25.** Plaintiffs have alleged that the State of New York, in the form of the State Legislature, contributed to the school segregation in Yonkers by, *inter alia,* passing and debating bills designed to limit the efficacy of State desegregation efforts and refusing to provide the financial support necessary for successful desegregation. *See, e.g.,* Second Amended Complaint of Plaintiff–Intervenors Yonkers Branch NAACP, et al., ¶¶ 20–25, 35, 37; Cross–Claim of the Yonkers Board of Education, ¶¶ 14–23, 30.

Contrary to what the State urges, neither the First Amendment nor the Speech and Debate Clause of Article 1, § 6 of the Constitution is implicated by a holding that acts and omissions of the State Legislature furnish the basis for a claim against the State under Title VI. The issue is not whether members of the State Legislature are to be punished under the Constitution or a federal statute for what was said and done in the Legislature during the years in question in this lawsuit. Rather, the issue is whether the State's attitude toward desegregation, as made known through what was said and done in the State Legislature, properly gives rise to an allegation that the State, along with its instrumentalities, contributed to a violation of rights for which the remedy of a lawsuit in federal court has been explicitly provided.

related only to State conduct occurring before 1985, and that pre–1985 conduct cannot give rise to a violation of Title VI in light of the effective date of that statute's non-retroactive abrogation of immunity (October, 21, 1986). The State further contends that the continuing *effects* of any discriminatory practices engaged in prior to October 21, 1986 are not actionable under a "continuing wrong" theory. The idea here is that the non-retroactive nature of Title VI's abrogation would effectively be nullified if the "continuing wrong" theory were allowed to make actionable acts occurring before the effective date of the statute.

The State is correct in pointing out that the presentation of evidence was limited, by agreement of the parties and the Court, to State conduct occurring prior to 1985. *See supra* p. 216. This fact alone does not insulate the State from the reach of Title VI, however, for unlike the State, we do not see a problem in respecting both the non-retroactive nature of Title VI's abrogation of immunity and the integrity of the principle that holds that a state violates the Fourteenth Amendment for as long as it fails to eliminate policies and practices traceable to a prior system of *de jure* segregation which it helped create. The "continuing wrong" theory collapses, in the unique context of equal opportunity in schooling, the traditional legal distinction between harmful acts, on the one hand, and their consequences or effects, on the other.[26] If, then, the pre–1985 acts of the State defendants contributed to the maintenance of a dual school system in Yonkers (a question the merits of which we address below), those acts can be said to be occurring *to this day* to the extent their effects have yet to be remedied.[27] The non-retroactive nature of Title VI's abrogation, with its October, 1986 cut-off date, therefore

properly does not bar this suit. *See Fordice*, —— U.S. at ——, 112 S.Ct. at 2743 ("To the extent that the State has not met its affirmative obligation to dismantle its prior dual system, it shall be adjudged in violation of the Constitution and *Title VI* and remedial proceedings shall be conducted") (emphasis added).[28]

■ It is equally clear, however, that the non-retroactivity of Title VI is to be given full effect in those situations where a "continuing wrong" theory does not apply. A state that successfully integrated a once-dual school system *prior to* October, 21, 1986, for example, would presumably be protected from a suit for damages by § 2000d–7(b).

In light of the foregoing, we hold that the Board of Regents and the SED, like the State of New York itself, may be sued under Title VI. And we conclude overall that the Eleventh Amendment does not bar this suit as it relates to any of the defendants with the one exception of Governor Cuomo.

### 2. *The Merits*

All of which brings us to the critical legal issues:

a) Is the State liable under 42 U.S.C. § 1983 for knowingly tolerating *de jure* segregation in Yonkers?

b) Is the State liable under 42 U.S.C. § 1983 for dealing with integration in a manner different from other educational matters?

c) Is the State liable under The Equal Educational Opportunities Act of 1974, 20 U.S.C.A. § 1701 *et seq.* (West 1990) ("EEOA")? Is this issue properly before the Court?

---

**26.** As we discuss below in our section on the UDC, this is not the case with regard to actions taken by governmental actors in areas other than education. *See infra* p. 242.

**27.** The State's position throughout this litigation has been that it did not intentionally support or contribute to the segregation in the Yonkers schools. The State has never made an alternative argument to the effect that, even if it *did* intentionally support or contribute to segregation in Yonkers prior to 1985, it has since taken the

steps necessary to eliminate the effects of its unconstitutional acts. Indeed, the Court has already found, in a separate proceeding, that vestiges of segregation do continue to exist in the Yonkers schools. *See United States v. Yonkers*, 833 F.Supp. 214 (S.D.N.Y.1993).

**28.** The *Fordice* Court appeared to assume, without actually deciding, that post-October, 1986 vestiges of pre-October, 1986 discriminatory acts are actionable under Title VI.

### a. *Liability under § 1983*

 The YBE and NAACP, in urging that the State is liable on a joint tortfeasor theory under § 1983 because it knowingly failed to address segregation in the Yonkers Public School System, although having a self-imposed duty to do so, rely primarily on a trilogy of cases arising in Ohio. *See Brinkman v. Gilligan,* 610 F.Supp. 1288 (S.D.Ohio 1985); *Penick v. Columbus Bd. of Educ.,* 519 F.Supp. 925 (S.D.Ohio 1981), *aff'd,* 663 F.2d 24 (6th Cir.1981), *cert. denied,* 455 U.S. 1018, 102 S.Ct. 1713, 72 L.Ed.2d 135 (1982); *Reed v. Rhodes,* 500 F.Supp. 404 (N.D.Ohio 1980), *aff'd,* 662 F.2d 1219 (6th Cir.1981), *cert. denied,* 455 U.S. 1018, 102 S.Ct. 1713, 72 L.Ed.2d 135 (1982).

In these cases, the courts dealt with the question of whether state inaction in the face of continued segregation in Dayton (*Brinkman* ), Columbus (*Penick* ), and Cleveland (*Reed* ) triggered state liability. Each court answered the question in the affirmative.

In language strongly relied on by the YBE and NAACP, the court wrote in *Reed* that:

> The failure of the State Board to take actions intended to eliminate segregation can, when combined with other facts, support a finding of constitutional violation, for 'the Constitution can be violated by inaction as well as deeds.' [citations omitted] Thus, a state which initially compelled or authorized the creation of a local dual system of education has a continuing affirmative duty to eradicate all lingering effects of segregation; the neglect of that constitutional duty renders the State liable.... Even if a State took no part in the creation of a local dual system of public education, it can be liable with local officials if it or its agents adhered to a deliberate policy of tolerating or supporting intentional racial segregation.

500 F.Supp. at 424. Although the court in *Reed* found inaction, "when combined with other facts", to be a basis for state liability in Ohio, it cited with approval the holding of the Second Circuit in *Arthur v. Nyquist,* 573 F.2d 134 (2d Cir.1978), *cert. denied,* 439 U.S. 860, 99 S.Ct. 179, 58 L.Ed.2d 169 (1978), that

a state's knowing failure to meet its obligation to eradicate segregation is insufficient to impose liability on the state. 500 F.Supp. at 424.

In *Brinkman,* the court concluded that:

> Had the state defendants acknowledged their affirmative obligations under state and federal laws to investigate and eliminate segregation and had the power to withhold state funding been exercised, there is a substantial probability that the Dayton schools would not be in the condition found to exist in 1972. The failure of the state defendants to exercise their obligations promptly under state and federal law was a proximate cause of the plaintiffs' deprivation....

610 F.Supp. at 1297. *See also Penick,* 519 F.Supp. at 941–42.

Of course, there are significant factual distinctions between the Ohio cases and this New York case, the most apparent perhaps being the initial responsibility of the State of Ohio for the creation of a dual school system. *See Brinkman,* 610 F.Supp. at 1293.[29] Nonetheless, were the Ohio cases to stand alone, we would find them highly persuasive.

But the Ohio cases do not stand alone; they must be considered together with *Arthur v. Nyquist.* In *Arthur,* suit was brought against the Commissioner of Education of the State of New York and the members of the Board of Regents, as well as against local Buffalo education officials. The district court found these defendants liable for intentionally causing and maintaining a segregated school system in Buffalo, and the Court of Appeals affirmed as to the local defendants. As to the state parties, however, the Court reversed.

The Court first noted that as early as 1960, the Board of Regents had issued a policy statement urging desegregation of the New York public schools. The Court next noted that the Commissioner had responded to a § 310 complaint filed in 1964 by requiring the Buffalo School Board to submit plans to desegregate. A plan submitted by the Buffalo Board failed to be implemented because

---

**29.** New York has outlawed *de jure* segregation since 1900.

the Buffalo City Council refused to appropriate funds. 573 F.2d at 145.

In 1972, the Commissioner instructed the Buffalo Board to submit a new plan, but it refused to do so. The Commissioner's staff then drew up and submitted its own recommendations to the Buffalo Board, but the Board rejected the proposals. Finally, in 1975, the Commissioner issued a show cause order to the Buffalo Board in which he threatened to exercise his statutory enforcement powers. In 1976, the *Arthur* class action was started.

The Court of Appeals began its legal analysis by noting that:

> Authority over education in New York State is vested in the Department of Education, which manages and supervises all New York State public schools.... The Commissioner is responsible for the implementation of educational policy formulated by the Board [of Regents]. He can enforce his directives by removing any school officer or member of a board of education who disobeys an order, and by withholding funds from a disobedient school system.

573 F.2d at 146.

The Court then wrote, in language highly relevant to these proceedings:

> Appellees argue on this appeal that, having primary responsibility for educational policy in New York State, the state appellants are liable for Buffalo's school segregation. They assert that the appellants are liable both because they failed to combat segregation as aggressively as they might have, and, in a derivative sense, because they are legally responsible for the City's segregative acts.

> We cannot disagree with the trial court's finding that it would have been possible for the state appellants to have intervened more forcefully in this matter.[30] Nor can we say that, given the chosen policies of the state appellants, it was unforeseeable that the Buffalo schools might remain segregated for an extended period of time.

We do not, however, believe that this kind of inaction on the part of state supervisory personnel can, under the standards promulgated by the United States Supreme Court, be said to constitute intentional segregation, and hence a constitutional violation. As we indicated in *Hart v. Community School Board, supra,* 512 F.2d [37] at 48 [ (2d Cir.1975) ]:

> We assume that mere inaction, without any affirmative action by the school authorities, allowing a racially imbalanced school to continue, would amount only to *de facto* rather than *de jure* segregation.

To argue otherwise would be to adopt the strictly objective view of segregative intent rejected above because it collapses *de facto* and *de jure* segregation, in effect making all continued toleration of segregation *de jure.* The state appellants have shown that legitimate policy considerations warranted their hesitation in intervening actively in the conduct of the Buffalo school system, and that the drastic remedies available to them could legitimately have been judged inappropriate under the circumstances of this case.

Of course, if it could be shown that state and local officials conspired to thwart state anti-segregation policy, our conclusion would perforce be different. But we have searched the record, and are unable to find any indication of such complicity, posturing, or bad faith.

Similarly, we do not believe that the appellees' theory of derivative or indirect liability can be sustained. Such a theory is precluded by the Supreme Court's opinion in *Rizzo v. Goode, supra,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 [1976], which requires a more direct link between the illicit school segregation and an intentional policy adopted by the state appellants which indicates specific approval of the actions of the city appellants. No such approval is indicated in this case.

Under the standard announced in *Hart,* then, we are unable to conclude that the state appellants acted or omitted to act

---

30. We note that this statement would apply *a fortiori* to Yonkers, since by virtue of the § 310 proceedings, the State played a far more active role vis-a-vis the Buffalo segregated schools than it did vis-a-vis the Yonkers segregated schools.

with the required segregative intent, and hence we must reverse the trial court's finding of liability as to these appellants. 573 F.2d at 146.

Although it is the case that in Buffalo there was a state response in progress to a § 310 proceeding and that no § 310 proceeding occurred in Yonkers, it is a close and difficult question whether the issues before this Court are qualitatively different from those dealt with by the Court of Appeals in *Arthur v. Nyquist.* The *Arthur* Court acknowledged the power that resided in the state educational authorities to deal with segregation in Buffalo and accepted the proposition that, "given the chosen policies of the state appellants, it was [not] unforeseeable that the Buffalo schools might remain segregated for an extended period of time." 573 F.2d at 146. But, the *Arthur* Court tells us, more than knowledge of wrongdoing and the power to end it is required before § 1983 liability can be imposed on a state. What else is required? If it can be shown that state and local authorities conspired to thwart state desegregation policies, the result would be different. If it can be shown that state officials gave local authorities *specific* approval, and thereby support, of their unlawful conduct, the result would be different. But the *Arthur* Court searched the record in vain for evidence of such complicity and approval, and we have engaged in a like inquiry, with like results. *See supra* pp. 224–225. The closest one approaches to approval is, in our opinion, the determination by the Commissioner and his staff not to recommend to the Legislature that funding proposals for the benefit of local school communities be made contingent on adoption of desegregation programs. But the reason advanced was a concern that the legislation would fail in its entirety, not a desire to perpetuate segregation.

 Indeed, there is no evidence of any affirmative pro-segregative action on the part of the State. The reining in of Commissioner Nyquist and the adoption of less aggressive integration statements over the course of the 1970's are compelling evidence that the State's policy with respect to local segregation grew increasingly passive and reactive, but the policy cannot fairly be categorized as being affirmatively in favor of segregation. State permissiveness and, in truth, state hypocrisy in the face of local segregation are not automatically tantamount to state encouragement and/or authorization of segregation. *See Arthur,* 573 F.2d at 146. That anti-desegregation groups in Yonkers tried to find in the State's permissiveness signs of actual, positive support for their position says something about the political forces at work in Yonkers; but it does not without more transform the State's failure to intervene in Yonkers into affirmative support of school segregation in Yonkers, from a legal standpoint. *Cf. Reitman v. Mulkey,* 387 U.S. 369, 373–81, 87 S.Ct. 1627, 1629–34, 18 L.Ed.2d 830 (1967) (concluding, in the context of a state-action inquiry, that the California legislature actually encouraged private acts of discrimination by expressing its "policy of neutrality" in the form of an amendment to the state constitution which prohibited, in ringing terms, any interference with such acts of discrimination).

Since we are unable to find, after an exhaustive inquiry, conduct on the part of the State which would satisfactorily distinguish this case from *Arthur v. Nyquist,* and since this case, rather than the Ohio precedents, is controlling on this Court, we answer in the negative the question of whether the State may be held liable for knowingly tolerating, *i.e.,* for not proceeding aggressively against, the *de jure* segregation that existed in the Yonkers schools.

b. *Liability for dealing with integration in a manner different from other educational matters*

 The YBE and NAACP urge a second theory of state liability under the Equal Protection Clause and § 1983 which has not so much to do with the nature of the State's involvement in Yonkers as it does with the inconsistent and racially-identifiable manner in which the State pursued its various policy goals. Plaintiffs argue:

[E]ven without regard to the intent underlying its conduct, the State unlawfully established an 'explicitly racial' classification by singling out the racial integration policy as the one State education policy that

would not be executed in accordance with the normal process of governance and decision making for education in New York State.

YBE Post–Trial Brief at 2.

We have found that the State's policy of passivity with regard to school segregation matters was atypical conduct on the part of the State; in all other areas of concern, the State adopted regulations and aggressively monitored and enforced compliance with State education policy. *See supra* p. 223. If, then, the operative legal principle here is what plaintiffs suggest—that a state violates the Equal Protection Clause if it singles out its race-oriented policies for neglect or lackluster enforcement—the facts of this case would probably compel a finding of liability on the part of the State.

However, we have neither found nor been directed to any authority that holds that, wholly apart from the question of whether a state is jointly responsible with local actors for acts of racial discrimination, a state violates the Equal Protection Clause if it fails to enforce its race-oriented policies as vigorously as its non-race-oriented policies. There is, to be sure, ample authority for the proposition that a state cannot, consistently with equal protection, pass a statute or other promulgation that has the practical effect of restructuring the governmental decision-making apparatus in a way that imposes unique burdens on racial minorities seeking to enact legislation. In *Hunter v. Erickson*, 393 U.S. 385, 89 S.Ct. 557, 21 L.Ed.2d 616 (1969), for example, the Supreme Court struck down an amendment to the city charter enacted by the citizens of Akron, Ohio, which required that any fair housing ordinance be approved by a majority of the city electorate, whereas all other ordinances could be passed by a vote of the city council itself. The Court found that the Akron amendment

> drew a distinction between those groups who sought the law's protection against racial, religious, or ancestral discriminations in the sale and rental of real estate and those who sought to regulate real property transactions in the pursuit of other ends. Those who sought, or would benefit from, most ordinances regulating the real property market remained subject to the general rule: [passage by vote of the city council]. But for those who sought protection against racial bias, the approval of the City Council was not enough. A referendum was required by charter at a general or regular election, without any provision for use of the expedited special election ordinarily available.

> . . . . . . . .

> Even though Akron might have proceeded by majority vote at town meeting on all its municipal legislation, it has instead chosen a more complex system. Having done so, the State may no more disadvantage any particular group by making it more difficult to enact legislation in its behalf than it may dilute any person's vote or give any group a smaller representation than another of comparable size.

393 U.S. at 390, 392, 89 S.Ct. at 560, 561. Similarly, in both *Washington v. Seattle School Dist. No. 1*, 458 U.S. 457, 487, 102 S.Ct. 3187, 3203, 73 L.Ed.2d 896 (1982), and *Lee v. Nyquist*, 318 F.Supp. at 720, it was held that laws limiting the extent to which certain educational authorities could assign students to schools on the basis of race worked a practical restructuring of the decision-making process as it related to education, and did so to the obvious detriment of those citizens who desired to improve the situation of racial minorities in the schools.

In each of these three cases, the equal protection violation lay in the fact that the state had adopted measures making it more difficult, from a procedural standpoint, to address racial issues in ways beneficial to racial minorities. Each of the challenged provisions created a procedural "gauntlet" that only those interested in the well-being of minority citizens were required to run. *Hunter*, 393 U.S. at 390, 89 S.Ct. at 560. Each provision singled out race as the one factor that warranted altered legislative procedures and redirected lines of policy-making authority. And, not coincidentally, each provision had the intended effect of hampering the achievement of racial equality.

Though the principles stated in *Hunter*, *Washington*, ·and *Lee* are compelling, they cannot be stretched to cover the facts of this case. It is certainly true that, owing to its passivity, the State addressed racial issues in education in ways that were less than optimally beneficial to racial minorities. But it cannot. be said that the State defendants distorted the governmental process by adopting measures making it more difficult to pursue a political path supportive of school desegregation. With the exception of Chapter 342, which was declared unconstitutional shortly after its passage, the State did not rig the political system in a way that "assist[ed] one particular group in its struggle with its political opponents." *Hunter*, 393 U.S. at 393, 89 S.Ct. at 562 (Harlan, J., concurring). Decision-making power was not abruptly shifted from central to local authorities (*see Lee*), or vice versa (*see Washington*), when it came to educational decisions bearing racial overtones. Rather, decision-making authority stayed where it always had been—with State educational authorities—and continued to be as susceptible to majority rule as ever. While some New York citizens may understandably have disliked the fact that the State did not push vigorously for desegregation, they were no more disadvantaged politically in their ability to seek changes in State policy than those who cheered the status quo.

It is these facts that distinguish this case from *Hunter, Washington,* and *Lee*. As Justice Harlan noted in *Hunter*, it is one thing

for supporters of racial equality to have to fight legislative battles with their hands tied behind their backs; it is another (quite constitutional) thing for supporters of racial justice to fail to win a majority of the votes needed to prevail in an equally-weighted voting system. 393 U.S. at 394–95, 89 S.Ct. at 562–63 (Harlan, J., concurring). Though State legislators and State education officials undoubtedly acted with racial consciousness in making decisions about segregation in the schools, they did not act pursuant to a voting scheme that weighted the votes in their favor. They therefore did not act pursuant to any racial classification that the courts have heretofore found. constitutionally untenable.

For the foregoing reasons, then, we reject plaintiffs' second argument for the imposition of liability on State educational authorities for the school segregation in Yonkers. We cannot conclude that, in the absence of any other constitutional violation, the State acted pursuant to a racial classification that was unconstitutional.[31]

### c. *Liability under the EEOA*

█ Before addressing the merits of the claims raised in regard to the UDC and housing, it is important to note the dialogue the Court has had with the parties relating to the relevance of a federal statute that was not otherwise cited by the plaintiffs in their complaint against the State nor relied upon by them as to any substantive questions of liability.[32] The EEOA provides in relevant part that:

---

31. The United States Supreme Court has decided to review a decision by the Colorado Supreme Court holding that a state constitutional amendment that prohibits considerations of sexual orientation from being used as grounds for preferential treatment or "protected status" violates the Equal Protection Clause. *See Evans v. Romer*, 882 P.2d 1335 (Colo.1994), *cert. granted*, — U.S. ——, 115 S.Ct. 1092, 130 L.Ed.2d 1061 (1995); *Evans v. Romer*, 854 P.2d 1270 (Colo.), *cert. denied*, — U.S. ——, 114 S.Ct. 419, 126 L.Ed.2d 365 (1993). The Colorado Supreme Court based its ruling on its conclusion that the state amendment infringes the fundamental right of citizens to participate in the political process on equal terms by making it comparably more difficult for members of an "identifiable group" (*i.e.*, those of homosexual or bisexual orientation) to win passage of legislation in their interest. 854 P.2d at 1282. The court assumed, without deciding, that gay men, lesbians, and bisexuals

do not constitute a suspect class. *Id.* at 1275. The Colorado case thus concerns the extent to which, *in the absence of a suspect class,* a state may remove from the normal, sub-constitutional legislative process issues that are of particular concern to discrete groups of citizens.

Here, however, plaintiffs sue on behalf of a group recognized by the courts to be a suspect class. This case accordingly presents different issues from those raised in *Romer*.

32. Neither the NAACP's Second Amended Complaint nor the YBE's Cross–Claim against the State includes any citation to the EEOA. However, the NAACP did rely on the EEOA for jurisdictional purposes in its papers in opposition to the State's motion to dismiss. *See* Plaintiff-Intervenors' Reply To State Defendants' Motion To Dismiss at 14–15 (filed with the Court on June 9, 1989).

No State shall deny equal educational opportunity to an individual on account of his or her race, color, sex, or national origin, by (a) the deliberate segregation by an educational agency of students· on the basis of race, color, or national origin among or within schools; (b) the failure of an educational agency which has formerly practiced such deliberate segregation to take affirmative steps ... to remove the vestiges of a dual school system....

*Id.* § 1703. For the purposes of § 1703, an "educational agency" is either "a local educational agency or a 'State educational agency' as defined by [20 U.S.C. § 2891]." *See* 20 U.S.C. §§ 1720(a), 3381. Section 2891 defines "local educational agency" as including public boards of education, such as the YBE. It defines "State educational agency" in a way that clearly includes both the SED and the Board of Regents: "The term 'State educational agency' means the officer or agency primarily responsible for the State supervision of public elementary and secondary schools." Section 1706 of the EEOA then permits

an individual denied an equal educational opportunity, as defined by this subchapter[, to] institute a civil action in an appropriate district court of the United States against such parties, and for such relief, as may be appropriate.

Finally, § 1714 of the EEOA provides that:

No court, department, or agency of the United States shall, pursuant to section 1713 of this title [prioritizing various remedial measures], order the implementation of a plan that would require the transportation of any student to a school other than the school closest or next closest to his place of residence which provides the appropriate grade level and type of education for such student.

■ In the course of addressing the issues raised by the plaintiffs' claims against the State, the Court itself considered whether the EEOA might be of some relevance. By telephone conference, followed by an order dated February 28, 1995, the Court alerted the parties to its consideration of the possible substantive impact of the EEOA on these proceedings. The concern with the

EEOA arose because the plain language of the· statute ·seems to provide a basis for holding a state vicariously liable for the discriminatory acts of local educational authorities. Indeed, it can be argued that if one were to set about to write a statute in a way that provided for vicarious state liability, one could not find language that was more clear and direct than that contained in § 1703 of the EEOA. The literal meaning of § 1703 is that a state denies an individual an equal educational opportunity by virtue of the discriminatory acts of local educational actors, without regard to the nature of the state's own involvement in the local schools. No "direct link" between the local violation and an intentional state policy, nor any "complicity," "posturing," or "bad faith" on the part of the state (the *Arthur* formulations) is required by § 1703's language before the state can be held accountable for a denial of equal schooling in a federal· action brought pursuant to § 1706.

The one case that has interpreted the EEOA in the desegregation context has concluded that the EEOA does authorize a form of derivative state liability. In *United States v. School District of Ferndale,* 577 F.2d 1339 (6th Cir.1978), the plaintiffs alleged, much as they do here, that the state defendants had known that local educational authorities were operating the schools in a racially segregated manner, and that, notwithstanding this knowledge, they continued to aid the maintenance of segregation "through the provision of state funds ... [and by] failing and refusing to take any necessary or appropriate action to bring the operation of the [local] schools into compliance with the Fourteenth Amendment...." 577 F.2d at 1346–47. The lower court dismissed the state defendants from the action on the grounds that, even if the state defendants were guilty of the alleged acts, they had not violated the substantive protections of the EEOA as contained in § 1703(a), (b) and (d).

The Sixth Circuit reversed the order of dismissal.

The gravamen of the complaint against the State defendants· is not that they directly engaged in discriminatory assignment of students and teachers, but that they toler-

ated and provided assistance to a local school district which they knew to be engaging in such practices. The District Court apparently felt that the statute applied only to direct acts of discrimination, not to indirect assistance to districts violating the [EEOA].

We do not believe that the State can escape liability under the [EEOA] merely because its support for the proscribed actions was indirect.... Congress plainly intended that the practices listed in § 1703 be ended. Such a goal can only be subverted by allowing states to knowingly support the prohibited practices with impunity. This is particularly true where state assistance forms a sizable part of the local school district's budget. We seriously doubt that Congress intended to allow states to bankroll dual school systems, while enacting a statute specifying remedies for the elimination of such systems.

577 F.2d at 1347–48 (citations omitted).[33] *See also Idaho Migrant Council v. Board of Educ.*, 647 F.2d 69, 70–71 (9th Cir.1981) (construing § 1703(f) of the EEOA to impose upon the states the supervisory duty of ensuring that local educational authorities do not fail to take action to overcome language barriers that impede equal participation in the schools).

In response to this Court's February 28, 1995 Order, the parties filed briefs. The YBE took the position that the EEOA was not of significance here because, like the State, it believed that the parameters of liability under the EEOA were coterminous with those under § 1983. But, as the YBE recognized, *see* Yonkers Board of Education's

Supplemental Brief in Response to the Court's Order of February 28, 1995 at 8, the language of the EEOA on its face appears to impose on the states the very type of supervisory liability for the conduct of local actors that the *Arthur* decision foreclosed. Moreover, since the *Arthur* Court's ruling that a state is not liable unless it acts affirmatively to foster segregation relates exclusively to an action brought under § 1983, and since the *Arthur* decision does not discuss the EEOA,[34] *Arthur* is not binding with respect to a finding of liability under the latter statute.

The NAACP took the position that the EEOA imposes on states the duty to ensure that segregative practices on the part of local educational agencies are stopped, and that a state's failure to so ensure renders it liable under the statute. The NAACP characterized the duty imposed by the EEOA as "coextensive with the Fourteenth Amendment, if more pointed and specific." Plaintiff–Intervenors' Memorandum of Law on Applicability of 20 U.S.C. sec. 1701 et seq. at 2–4 & n. 2.

The State, in addition to reasserting its position regarding the sovereign immunity implications of the EEOA and contesting the nature of the substantive rights guaranteed by it, argued that the legislative history of the EEOA persuasively indicates that Congress intended the statute to be an antibusing measure and not a basis for expanding state liability in school desegregation cases. Moreover, the State argues that the limitations on remedies imposed by the EEOA, which include limits on the use of involuntary busing, *see* 20 U.S.C. § 1714, relate to the totality of a remedial scheme

---

**33.** The *Ferndale* Court appeared to believe that the standard of state liability under § 1703 of the EEOA was coextensive with the standard of state liability under 42 U.S.C. § 1983. *See* 577 F.2d at 1348 (noting that the same principle of joint liability animates the two statutes). *But see id.* at 1346 (reserving decision on whether the rights guaranteed by the two statutes are the same). The State relies on this fact to argue that *Arthur v. Nyquist*, setting forth the Second Circuit's construction of state liability under § 1983, controls any interpretation of § 1703 of the EEOA, such that if plaintiffs lose under *Arthur*, they lose under the EEOA. *See* The State Defendants' Brief in Response to the Court's February 28, 1995 Order at 9–10.

However, as discussed above, the Sixth Circuit has interpreted liability under § 1983 in a more expansive way than the Second Circuit. *See supra* part III.A.2.a. Any conclusion on the Sixth Circuit's part that the EEOA imposes the same substantive duties as § 1983 is attributable, in our view, to its more expansive reading of § 1983 rather than to an overly broad interpretation of the scope of the duties imposed by the EEOA.

**34.** Neither the *Arthur* decision itself, nor the pleadings and briefs filed in the case, contains any citation or reference to the EEOA.

ordered by a court, and thus would preclude resort to the EEOA in a case, such as this one, in which a remedy order imposed a decade ago and still in force utilized busing.

The Court finds the question whether it should *sua sponte* rely on the EEOA for the purpose of assessing the State's liability on the schools issue to be an extremely troublesome one. On the one hand, the issues relating to the EEOA are purely legal questions, and a voluminous record has been compiled in this case which is entirely relevant to EEOA liability. Failure to address the question of EEOA liability might lead to the commencement of a new proceeding explicitly predicated on that statute, with an attendant waste of resources by the litigants and the courts.

On the other hand, plaintiffs, aided by able counsel with vast experience in school desegregation litigation, have chosen not to move to amend the complaint to encompass an EEOA claim and have only equivocally embraced a reliance on that statute.

On balance, we conclude that the most prudent course of action is to confine this opinion solely to the issues directly presented by the parties, *i.e.*, the State's liability under § 1983 and other claims explicitly stated in the complaint. We leave to another day and any further application of the parties the question of whether, in the context of the Yonkers desegregation proceedings, the EEOA provides any basis for relief from the State.

### B. *Housing*

#### 1. *Introduction*

We turn next to the questions relating to the State's role in site selection and development of housing in light of this Court's prior determination, *see* 624 F.Supp. at 1500–1503, affirmed by the Court of Appeals, *see* 837 F.2d at 1233, that there is a close interrelationship between school segregation and segregative housing patterns in Yonkers, each affecting and aggravating the other.

The YBE and NAACP claim that the UDC's actions relating to site selection for housing in Yonkers create an independent ground for liability against the UDC. Alter-

natively, they claim that these actions by the UDC can be imputed to the State or to State education officials in order to find these defendants liable. Finally, they appear to make the argument that the conduct of the State education officials themselves must be evaluated in a context that includes recognition of the housing conditions in Yonkers and that this circumstance distinguishes this case from *Arthur v. Nyquist*. In essence, this final contention is that the State's affirmative role in site selection for Yonkers housing provides the "something more" than mere passive condoning of segregation which the Court found in *Arthur v. Nyquist* and which this Court has found herein, absent a consideration of the housing aspects of this case.

The YBE and NAACP rely on a number of cases in which state participation in housing has been a basis for imposition of state liability for school segregation. In a case concerning the city of Indianapolis, for example, the Seventh Circuit held:

> Undoubtedly there are many contributing causes for racial segregation. But however complex the problem, it is clear that if residential segregation results from current or past segregative housing practices, there is a causal relation between those practices and the segregated schools. Therefore, *if the state has participated in or contributed to these segregative housing practices* either directly (e.g., selective location of public housing) or indirectly (e.g., involvement in discriminatory practices in the private housing market), *it can be said that the state has caused, at least in part, the segregation in schools.*

*United States v. Board of Sch. Comm'rs,* 573 F.2d 400, 408–09 (7th Cir.) (emphasis added) (footnote omitted), *cert. denied,* 439 U.S. 824, 99 S.Ct. 93, 58 L.Ed.2d 116 (1978). In particular, the YBE and NAACP point to cases in which courts have held states liable due to the participation of state agencies in the development and concentration of segregated housing within a city. *See, e.g., Little Rock Sch. Dist. v. Pulaski County Special Sch. Dist. No. 1,* 778 F.2d 404, 426 (8th Cir.1985), *cert. denied,* 476 U.S. 1186, 106 S.Ct. 2926, 2927, 91 L.Ed.2d 554 (1986); *Evans v. Buchanan,* 393 F.Supp. 428, 435, 438 (D.Del.

1975), *aff'd,* 423 U.S. 963, 96 S.Ct. 381, 46 L.Ed.2d 293 (1975); *Oliver v. Kalamazoo Bd. of Educ.,* 368 F.Supp. 143, 183 (W.D.Mich. 1973), *aff'd sub nom., Oliver v. Michigan State Bd. of Educ.,* 508 F.2d 178 (6th Cir. 1974), *cert. denied,* 421 U.S. 963, 95 S.Ct. 1950, 44 L.Ed.2d 449 (1975).

### 2. Claims Against the UDC and its Present Director; Statute of Limitations

■■■■ The State urges that plaintiffs' claims against the UDC and its present director are barred, as a matter of law, by the statute of limitations. The statute of limitations for actions under both § 1983 and Title VI is that applicable to personal injury actions in the state in which the appropriate federal court sits. In New York, this time period is three years. *See Owens v. Okure,* 488 U.S. 235, 251, 109 S.Ct. 573, 582, 102 L.Ed.2d 594 (1989) (§ 1983); *Dory v. Ryan,* 999 F.2d 679, 681 (2d Cir.1993) (same), *modified,* 25 F.3d 81 (2d Cir.1994); *Mussington v. St. Luke's–Roosevelt Hosp. Ctr.,* 824 F.Supp. 427, 433 n. 4 (S.D.N.Y.1993) (title VI), *aff'd,* 18 F.3d 1033 (2d Cir.1994) (*per curiam*); *Barcia v. Sitkin,* 89 F.R.D. 382, 385 (S.D.N.Y.1981) (same). A claim accrues for purposes of the statute of limitations when the discriminatory act occurs and plaintiffs know or have reason to know of it, even though the "most painful" effects of the discrimination may occur later. *Delaware State College v. Ricks,* 449 U.S. 250, 258, 101 S.Ct. 498, 504, 66 L.Ed.2d 431 (1980) (quoting *Abramson v. University of Hawaii,* 594 F.2d 202, 209 (9th Cir.1979)); *Morse v. University of Vermont,* 973 F.2d 122, 125 (2nd Cir.1992). "The relevant date is when the 'operative decision' to act is made, since it is the decision, rather than the action itself, which is the basis of a discrimination claim." *Mussington,* 824 F.Supp. at 432 (citing *Chardon v. Fernandez,* 454 U.S. 6, 8, 102 S.Ct. 28, 29, 70 L.Ed.2d 6 (1981) (*per curiam*)).

■■ The State urges, and we agree, that any improper operative decisions by the housing defendants in this case occurred by 1972, and certainly by 1975. The UDC's selection of sites for the construction of housing in Yonkers was made pursuant to a Memorandum of Understanding entered into with the City in July 1970 and amended in 1971 and 1972. YBE Exhs. 19–81; 19–113; 19–174. There is no evidence that the UDC's site selection activities after 1972 produced any housing. Moreover, these activities ceased altogether in 1975, when the State bailed out the UDC from fiscal disaster and effectively ended its housing program. YBE Exh. 6–66; YBE Exh. 20–63 at ¶ 10; Tr. 1690–92 (Danielson). Since plaintiffs knew or should have known of the UDC's site selections at the time and did not commence this suit until 1987, we find that their claims against the UDC are barred by the three year statute of limitations.[35]

The YBE and NAACP urge that the statute of limitations is not a bar because the UDC has a continuing obligation to take corrective action to eliminate all vestiges of segregation to which it has contributed. This duty, it is contended, remains in force until all vestiges of segregation in the school system have been eradicated, an event which this Court has already held has not yet occurred. *See* 833 F.Supp. at 225.

We agree, however, with the State that there is no authority for applying a "continuing wrong" theory to the housing defendants here. Although the courts have held some governmental entities to have an affirmative duty to take steps to eliminate the effects of past school segregation and have found a failure to take these steps to be a continuing violation of the affirmative duty, *see Penick,* 443 U.S. at 458–59, 99 S.Ct. at 2946–47;

---

**35.** The State housing defendants alternatively argue that plaintiff's claims should be barred by the equitable doctrine of laches. We disagree. Defendants assert that they have suffered prejudice by virtue of their absence from the lengthy discovery and trial proceedings involving the liability of the City of Yonkers and the YBE. However, defendants' only significant showing of prejudice is the unavailability of one witness, Frank Kristof, who we find was not the sole repository of any critical testimonial evidence. *See* Tr. 2311–17 (Winnick). As we stated in an earlier opinion, it can be wondered, in light of the voluminous record already compiled at the expense of other parties, whether defendants should view their belated joinder in this litigation as a bane or a blessing. *See United States v. City of Yonkers,* No. 80 Civ. 6761, 1989 WL 88698, at *1 (S.D.N.Y. Aug. 1, 1989).

*Green v. County Sch. Bd.*, 391 U.S. 430, 437, 88 S.Ct. 1689, 1693, 20 L.Ed.2d 716 (1968), this doctrine seems to have been limited only to defendants with an ongoing, pervasive role in matters directly affecting school attendance zoning. *See Richmond v. J.A. Croson Co.*, 488 U.S. 469, 524–25, 109 S.Ct. 706, 737–38, 102 L.Ed.2d 854 (1989) (Scalia, J., concurring); *Bazemore v. Friday*, 478 U.S. 385, 408, 106 S.Ct. 3000, 3012, 92 L.Ed.2d 315 (1986) (White, J., concurring). The rationale for finding a continuing wrong by school authorities in these cases is that every assignment by school authorities of a minority student to a minority school is a new discriminatory act. *See Palmer v. Board of Educ.*, 46 F.3d 682, 685 (7th Cir.1995) (Easterbrook, J.). As defendants point out, "[t]here is no evidence, however, that UDC had such power over schools, students, or attendance lines, or assisted the Board in its exercise of such powers." State Post–Trial Brief at 73. Therefore, since the UDC's activities in Yonkers took place within a finite time interval and ceased entirely in 1975, this suit, commenced in 1987, cannot be maintained. We accordingly dismiss the claims against the UDC and its present director.

### 3. *Housing–Based Claims Against the State Education Defendants*

It remains to be examined, however, whether the actions of the UDC can be imputed to the State education defendants or whether these defendants, acting with knowledge and awareness of Yonkers housing developments, are liable for what they did or failed to do in Yonkers in light of such knowledge. If these defendants are so liable, it is clear that their violations are continuing ones and that the statute of limitations does not apply. *See Penick*, 443 U.S. at 458–59, 99 S.Ct. at 2946–47; *Green*, 391 U.S. at 437, 88 S.Ct. at 1693.

▪ The YBE apparently argues that this Court should impute the actions of the UDC to either the State or to State education officials in order to hold these defendants liable. YBE Post–Trial Brief at 25–26. We disagree. As the State asserts, "[t]he absurdity of the argument is that it would allow the Board to sue the State as liable for the actions of the Board itself." State Post–Trial Brief at 55. The circumstances under which acts of a subdivision or creation of the state may be imputed to the state or to one of its agencies are far more limited than the YBE suggests. *See Washington*, 458 U.S. at 480–82, 102 S.Ct. at 3200–01 (noting that in *Milliken v. Bradley*, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974), "the actions of a local school board could not be attributed to the State that had created it"); *Bush v. Viterna*, 795 F.2d 1203, 1206 (5th Cir.1986) (state commission on jail standards could not be held vicariously liable for acts of county officials in maintenance of jails); *cf. Austin Indep. Sch. Dist. v. United States*, 429 U.S. 990, 991, 994, 97 S.Ct. 517, 517, 519, 50 L.Ed.2d 603 (1976) (Powell, J., concurring) (suggesting that school officials cannot be held liable for racial imbalance in the schools which results from the discriminatory housing practices of other governmental actors); *Bell v. Board of Educ.*, 683 F.2d 963, 968 (6th Cir.1982) (rejecting the argument that "a school board otherwise innocent of segregative intent is liable for the discriminatory housing practices of other governmental agencies.").

▪ The question would be more difficult if the UDC were an arm or instrumentality of the State, like the SED. As we stated in our previous liability decision:

It is undisputable that a hypothetical single state agency which controls the operation of, and engages in the racial segregation of, both housing and schools—by confining for racial reasons the city's subsidized housing to one section of the city, while simultaneously adhering to a neighborhood school policy of student assignment—can be held liable for such conduct. It is inconceivable that state action may be fractionalized such that two state agencies could be permitted to collectively engage in precisely the same conduct, yet avoid legal accountability for the identical result.

*Yonkers Board*, 624 F.Supp. at 1534. However, although created by the State, the UDC is an entity distinct and separate from the State, with substantial operational autonomy. Like a municipality, the UDC is by statute a political subdivision of the State. *See Cine*

*42nd Street Theater Corp. v. Nederlander Org., Inc.,* 790 F.2d 1032, 1044, 1047 (2d Cir.1986). Indeed, the Second Circuit has already held in this case that "[t]he UDC does not act in a sovereign capacity, and therefore they may not successfully assert the Eleventh Amendment as a defense." *See United States v. Yonkers,* No. 92–6198, slip op. at 3, 990 F.2d 623 (2d Cir. Jan. 13, 1993) (citing *Cine 42nd,* 790 F.2d at 1044).

Although the YBE points to cases involving Little Rock, Indianapolis, and Wilmington in which federal courts arguably imputed to state defendants responsibility for school segregation caused in part by the segregative conduct of state-created municipal housing agencies, *see Little Rock Sch. Dist.,* 778 F.2d at 423–27; *U.S. v. Board of Sch. Comm'rs,* 637 F.2d 1101, 1116 (7th Cir.1980); *Evans,* 393 F.Supp. at 435, these cases either predate *Monell v. Department of Social Servs.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) and *City of St. Louis v. Praprotnik,* 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988) or relate to circumstances in which the state itself historically had fostered a dual school system.[36] They do not support YBE's general assertion that state liability for school segregation may be predicated on acts of local subdivisions.

Further, in declining to impute the actions of the UDC to State education officials, we note that the relationship between these parties differed from the relationship that we found to exist between the City of Yonkers and the YBE in our previous liability decision. In that decision, we found that not only was there evidence of intentionally segregative conduct on the part of local school officials, *see Yonkers Board,* 624 F.Supp. at 1533 (distinguishing the situation in Yonkers from that in *Bell* ), but also that any legal separation between the City and the YBE

was "artificial and constitutionally insignificant" in light of mayoral appointments to the YBE that furthered common segregative objectives. *See* 624 F.Supp. at 1534–35. Here, there is no evidence of segregative conduct on the part of State education officials; moreover, there is no evidence that these officials and the UDC worked together in any concerted manner in pursuit of a common segregative goal.

 Therefore, we must address the YBE's other theory of recovery, based on the actions of the UDC, against State education officials. To what extent does the passive response of the Commissioner, the Board of Regents and other State educational officers to Yonkers school segregation create liability because of the fact that the UDC did not vigorously resist, and indeed acquiesced in, segregative Yonkers housing patterns? In other words, does the State education officials' knowledge[37] of the UDC's participation in site selection for Yonkers housing alter our holding, set forth above, that the conduct of these education officials is not actionable under the standard of *Arthur v. Nyquist.* We hold that it does not.

As noted above, *Arthur* held that state officials cannot be held liable for their mere inaction or failure to combat the segregative acts of local officials. 573 F.2d at 146. Without imputing the actions of the UDC to State education officials, which we have already decided would be inappropriate in this case, we do not see how the education officials' knowledge of the UDC's role in Yonkers housing segregation distinguishes these officials from those in *Arthur.* After all, the fact that State education officials knew of the segregative housing practices of Yonkers officials did not make the conduct of the State officials actionable under the *Arthur* standard. Since the UDC is the legal equivalent

---

**36.** *Monell* and *Praprotnik* would preclude the vicarious liability under § 1983 of State education officials for the actions of the UDC. Moreover, at least one court has found that there also can be no vicarious liability under Title VI. *See Hodges v. Public Building Comm'n,* 873 F.Supp. 128, 132 (N.D.Ill.1995); *cf. Springer v. Seaman,* 821 F.2d 871, 881 (1st Cir.1987) (finding no case addressing the issue of vicarious liability under Title VI). Although the EEOA appears to provide precisely the type of vicarious liability not other-

wise imposed under § 1983 and Title VI, *see supra* pp. 239–240, the EEOA does not apply to the actions of the UDC, but only to the actions of "educational agencies" or the state itself.

**37.** There is evidence that at least some SED staff knew during the mid-to-late 1970's that Yonkers was planning to build subsidized housing in a way that would enhance segregation. Sobel Deposition at 223.

of a municipality, like Yonkers, *see supra* pp. 243–244, there is no reason to find that the State education officials' knowledge of UDC involvement in these local housing practices tips the *Arthur* balance in favor of a finding of state liability.

## IV.

### Conclusion

We thus conclude that the extensive record compiled herein furnishes no basis for the imposition of liability on any State defendant. We reach this conclusion with reluctance for several reasons.

First, we find entirely unpersuasive the argument of the State that it lacked full knowledge of the nature, cause and extent of the segregation in the Yonkers public schools. For example, not to have been aware of the segregative aspects of special education in Yonkers, *see* 624 F.Supp. at 1453–62; 837 F.2d at 1196–97, despite careful scrutiny of Yonkers special education in general, would have required a careful avoidance of such knowledge.

We find similarly unpersuasive the State's contention that it lacked the power to address adequately the problem of school segregation. There is no doubt in our mind that the State possessed the full means and authority needed to deal with Yonkers school segregation, had it been inclined to do so. We conclude that the State determined not to take any affirmative action to deal with Yonkers school segregation because of political and other pressures, from within the Board of Regents and from without, which opposed vigorous desegregation efforts. These pressures can only be explained in racial terms.

However, we find no basis for imposing liability on the State because we find ourselves constrained by the decisional rule set forth in *Arthur v. Nyquist.* As have we, the court in *Arthur* found that the state had the power and duty to address segregation (there, in Buffalo), but nevertheless held that the absence of affirmative participation by the state in local pro-segregative conduct compelled a finding of no-liability. The teaching of *Arthur* is that abdication by the state in discharge of its duty to cause local districts to desegregate does not afford a basis for liability. Able counsel for the YBE and NAACP advance no claim that *Arthur* does not continue to be an accurate statement of the law in this Circuit which is binding on this Court. Rather, they contend that they have proven a more direct link between State action and school segregation.

In the end, we conclude that the differences between this case and *Arthur* are quantitative, not qualitative. The extent of the State's determination *not* to act vis-a-vis school desegregation in Yonkers and the consequences of that inaction have been fully documented; but no more has been shown. Accordingly, we conclude that the complaint against all the State defendants must be dismissed.

With respect to housing issues, we have found that the UDC acquiesced in the segregative site selections of Yonkers officials. However, any claims against the UDC and its present director are barred by the statute of limitations. Moreover, the actions of the UDC cannot be imputed to the State or to State education officials. Finally, the State education officials' awareness of the housing situation in Yonkers does not alter our analysis of the liability of these officials under *Arthur v. Nyquist.*

As previously noted by this Court, *see United States v. City of Yonkers,* No. 80 Civ. 6761, 1992 WL 176953, at *1–*2 (S.D.N.Y. July 10, 1992), these conclusions do not leave the YBE and NAACP without a remedy to deal with the vestiges of segregation which the Court has found to exist in Yonkers. The City of Yonkers remains liable to deal with the segregation that it has caused in the Yonkers Public Schools.

The parties are to advise the Court in writing within twenty (20) days from the date hereof as to how and when they wish to proceed with the remaining phases of this litigation.

SO ORDERED.